Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta.
La controversia de autos no puede examinarse aislada-mente ni como una querella más de conducta profesional, sino que debe considerarse en el contexto del complejo en-tramado de los contratos entre la empresa privada y el gobierno en nuestro pas. Hace más de una década emiti-mos las palabras que hoy nos deben servir de marco contextual en materia de apariencia de conducta impropia en la gestión pública:
... [d]ebe tenerse en cuenta que vivimos en una época aciaga, que se caracteriza por la creciente y justificada descon-fianza de la gente en sus instituciones. Es de conocimiento general que prevalece en el pas la sospecha y la suspicacia con respecto a los procesos colectivos. In re Toro Cubergé, 140 D.P.R. 523, 535 (1996).
Ante esta realidad, nos corresponde cumplir nuestro de-ber irrenunciable de guardar el delicado balance que ga-rantiza mantener intacta esa confianza colectiva. Cuando el interés público está involucrado, los ojos del país, con mucha razón, escudriñan nuestro proceder con especial recelo. En estas situaciones, la consistencia no puede con-vertirse en un valor de tal naturaleza que impida desarro-llar una norma adecuada a las circunstancias. Cierta-mente, debemos velar por que la inconsistencia no ponga en entredicho la legitimidad de nuestro poder inherente para regular la profesión legal.(1) Sin embargo, esa consis-tencia no debe ser *375 el resultado de una aplicación formalista y mecánica del Derecho. La opinión mayoritaria, en aras de ser conse-cuente con las normas que hemos desarrollado para guiar a los abogados y las abogadas al efectuar transacciones de negocios con sus clientes, aplica dichas normas sin consi-derar que en casos como éste el cliente es, a fin de cuentas, el interés público, lo cual requiere una normativa propia. Además, en el contexto de la contratación con agencias del Gobierno, la apariencia cobra mayor importancia, convir-tiéndose en foco central de nuestra evaluación ética.
Por eso, y por las razones que expondré a continuación, no puedo suscribir la opinión del Tribunal.
HH
En su informe de 16 de diciembre de 2002, el Procura-dor General explicó que comparecía como resultado de su intervención en
... investigaciones relacionadas con ciertos abogados que, por medio de contratos de servicios profesionales previos con ciertas dependencias gubernamentales, obtienen información y establecen influencias para posteriormente crear entes cor-porativos, los cuales, operando a manera de su alter ego, pro-ceden después a contratar con la dependencia gubernamental bajo acuerdos que le resultan sumamente favorables.(2)
Tras estudiar la extensa ponencia del Procurador General, que calificó la conducta del querellado como “alarman-te y a todas luces impropia”,(3) y luego de haber contado *376 con la comparecencia del querellado, el 13 de octubre de 2003 ordenamos que se presentara la querella corres-pondiente. Una vez recibida la contestación del imputado a la querella, el 15 de enero de 2004 designamos al Ledo. Enrique Rivera Santana, ex Juez del Tribunal Superior, como Comisionado Especial para que aquilatara la prueba y emitiera las correspondientes determinaciones de hecho y recomendaciones.
Tras examinar la abundante prueba documental y tes-tifical presentada por las partes, el Comisionado Especial produjo un informe con extensas determinaciones de he-chos, de las cuáles sólo reproduciré las que entiendo perti-nentes para sostener mi disenso.
A la fecha de los hechos, el querellado era uno de los socios propietarios del Bufete Cancio Nadal, Rivera, Díaz y Berrios (Bufete), con un 30 de participación. Desde 1991 fungía como su socio administrador. En 1994, el Bufeté co-menz sus relaciones contractuales con la Administración de Desperdicios Sólidos (ADS). Como parte de sus servi-cios, el Bufete se obligaba a revisar y estudiar documentos legales que versaran sobre materias que requirieran un conocimiento especializado en el campo de derecho am-biental; preparar proyectos de contrato entre la ADS y ter-ceras personas, y a preparar proyectos especializados, en-miendas de ley y reglamentación con relación al manejo y recuperación de desperdicios sólidos. Dada la política pú-blica gubernamental de privatizar algunas gestiones gu-bernamentales, el querellado encauzó los recursos de su Bufete en la encomienda de crear una entidad en forma de consorcio que integrara servicios variados para atender los requerimientos programáticos del Gobierno. De acuerdo con el Comisionado Especial, la idea fue tomando forma a partir del 1994, el mismo año en que la ADS contrató los servicios profesionales del Bufete. El consorcio se llamó Integrated Services Partnership (I.S.P.). El Bufete siempre se consideró como el componente que ofrecería asesoría legal dentro de I.S.P.
*377 En marzo de 1995, la ADS adoptó el Plan de la Infraes-tructura Regional para el Reciclaje y la Disposición de Des-perdicios Sólidos (Plan). Una vez la ADS adoptó este Plan, el Bufete comenzó a ampliar los servicios profesionales que ofrecía a esa agencia y a aumentar sustancialmente sus honorarios, mediante enmiendas al contrato de servicios profesionales. De acuerdo con el Informe del Comisionado Especial, el 28 de mayo de 1996 y en febrero de 1997 el Bufete escribió a los correspondientes Directores Ejecuti-vos de la ADS explicándoles que, en vista de que la implan-tación del Plan estaba en etapas más complejas, se proyec-taba una mayor dependencia de la agencia en entidades especializadas, entre ellas, el Bufete. Según nos informó el Comisionado Especial, en la comunicación de febrero de 1997 se da constancia del conocimiento en detalle que tenía el querellado sobre el Plan.
De acuerdo con las determinaciones de hechos del Comi-sionado Especial, a principios de 1998 el querellado se re-uni con el entonces Gobernador, Dr. Pedro Rosselló Gonzá-lez, a quien “le presentó la idea del consorcio que ya antes había visualizado”. Al cabo de esa reunión, el Gobernador dio instrucciones a los miembros de su gabinete de implan-tar la idea del consorcio. Mediante una orden ejecutiva de 19 de abril de 1998, el Plan se elevó a política pública gu-bernamental en materia de desperdicios sólidos. El 21 de mayo de 1998, el querellado se comunicó nuevamente con el Gobernador, esta vez por escrito. De acuerdo con el Co-misionado Especial, en dicha misiva le detalló la idea pro-puesta y sugirió que se adoptara el consorcio y un comité de la ADS, cuyo propósito sería el de garantizar la conti-nuidad y consecuencia en la implantación del Plan. Para ese momento, ya el comité de la ADS se había creado y el querellado formó parte de éste. Consecuentemente, I.S.P. le hizo una presentación a la ADS. Todo lo anterior ocurrió durante la vigencia del contrato de servicios profesionales entre el Bufete y la ADS.
*378 El 22 de junio de 1998, el querellado le envió una carta a la Directora Ejecutiva de la ADS en la que se resaltaba el hecho de que el Bufete había prestado servicios legales a la ADS relacionados con la implantación del Plan. En dicha misiva se solicitaba la renovación del contrato para que la ADS pudiera contar con los servicios legales del Bufete y así “poder cumplir con las altas encomiendas públicas que la [agencia] se ha trazado”.
En septiembre de 1998 el Bufete y la entonces Directora de la División Legal de la ADS prepararon un modelo del contrato que suscribiría la ADS con el consorcio que se es-cogiera para la implementación del Plan. El 2 de octubre de 1998 ya estaba elaborado el concepto final del consorcio, por lo que I.S.P., a petición de la ADS, sometió una pro-puesta a dicha agencia para que ese consorcio se hiciera cargo de proseguir la implantación del Plan. Otras dos en-tidades también presentaron sus respectivas propuestas. El 7 de octubre, el querellado envió una carta al Director Ejecutivo de la ADS, en la que menciona las reuniones que la ADS y el Bufete celebraron para hacer viable la pro-puesta de trabajo que sometió el consorcio. El Comisionado Especial cita de la misiva lo siguiente:
“Para viabilizar una propuesta de trabajo abarcadora y res-ponsable, que concretara nuestros ofrecimientos para responder a las necesidades reales de la ADS, el consorcio de entida-des se reunió entre sí y con personal de dicha agencia los días 15, 19 y 29 de septiembre de 1998. Destaco la reunión del 19 de septiembre del 1998 ... por cuanto en dicha ocasión se nos brindó un cuadro del estado de la situación de todos los pro-yectos comprendidos en la Fase I de la implantacin del Plan. Gracias a la informacin provista, [el Bufete] CNRD y el grupo de profesionales [integrantes del consorcio], pudimos elaborar la propuesta de trabajo que se describe en el borrador de con-trato que respetuosamente sometemos ante su consideración y el cual contiene términos y condiciones sumamente razonables para asistir a la ADS a alcanzar las metas trazadas en un proyecto de magna envergadura como lo es la implantación del Plan.” (Énfasis nuestro y en el original.) Informe del Comisio-nado Especial, pág. 16.
*379 El 16 de octubre de 1998 se presentó el certificado para la incorporación de la Puerto Rico Infraestructure Management Group, Inc. (PRIME), sucesora de I.S.P. PRIME sería un consorcio de servicios integrados encaminado a proveer a la ADS todo lo relacionado con la disposición de desperdicios sólidos en Puerto Rico y en la implantación del Plan. El Bufete se encargaría de toda la fase legal relacio-nada con el Plan. Desde su incorporación, PRIME sólo tuvo dos accionistas, de los cuales el querellado fue el mayorita-rio, con un 75 de las acciones de la corporación.
Una vez seleccionada PRIME, ésta y la ADS trabajaron en la elaboración de un contrato que se conocería como el Management Assistance Service Agreement (MASA), que regiría la incumbencia de PRIME en la implementación del Plan. Como el Bufete era una de las entidades que forma-ban parte de PRIME, y aún estaba vigente el contrato de servicios profesionales entre éste y la ADS, una de las ase-soras legales de la agencia expresó preocupación por que fuera el querellado quien negociara los términos y las con-diciones del MASA. Fue entonces cuando PRIME subcon-trató a otro abogado para que fungiera como su represen-tante y negociara el MASA con la ADS. Durante la negociación del MASA, nuevamente la representación legal de la ADS planteó la posibilidad de conflicto de intereses por parte del Bufete, al tener un contrato vigente con la agencia y, a la vez, ser parte de PRIME. El Bufete optó entonces por dar por terminado el contrato de servicios profesionales que tenía con la ADS el 16 de noviembre de 1998.
A pesar de que se había escogido al Ledo. Pedro Santiago como el intermediario entre la ADS y PRIME, por ser Presidente de esta última entidad, surge de las determina-ciones de hecho del Comisionado Especial que el querellado estuvo involucrado en el proceso de contratación. Por ejem-plo, se obtuvo su aprobación sobre lo que resultó ser la es-tipulación del alcance del trabajo acordado; el querellado *380 también aprobó el acuerdo sobre honorarios y otros gastos que se pagaría a PRIME y a sus entidades. Luego de por lo menos 40 borradores, el 15 de enero de 1999 se autorizó el otorgamiento del contrato entre la ADS y PRIME.
De acuerdo con lo pactado, PRIME proveería todos los servicios legales relacionados con los proyectos de infraes-tructura, además se le facultaba para subcontratar a cada una de las entidades que componían el consorcio, inclu-yendo al Bufete. A PRIME se le asignó la suma de $5,500,000 para servicios de consultoría por seis meses. El costo anual máximo para el desarrollo de los proyectos du-rante el tiempo acordado ascendía a $8,779,200, además del 10% de ese importe para el reembolso de gastos. De esa suma se fijó al Bufete la cantidad de $1,320,000 más $132,000 para el reembolso de gastos, en total $1,452,000. Además de las cantidades asignadas a cada uno de los componentes de PRIME, a PRIME como tal se le asignó la suma máxima anual de $1,200,000, más $120,000 para el reembolso de gastos. PRIME pagaba un salario al quere-llado facturado a la ADS en concepto de servicios de con-sultoría; al año 2000 se fijó esta suma en $144,000 anuales. Además, desde 1999 y durante la vigencia del MASA, el querellado recibía un estipendio mensual de $2000 en con-cepto de gastos de automóvil y otras misceláneas. Adicional a eso, por lo menos en dos ocasiones PRIME distribuyó dividendos a sus dos accionistas, entre ellos, el querellado.
Resulta imperativo mencionar que Comisionado Especial resalta en su informe que el contrato entre PRIME y la ADS disponía que los subcontratistas componentes del con-sorcio observarían completa lealtad a la ADS, mientras que en el contrato entre el Bufete y PRIME, el Bufete pro-metió completa lealtad a PRIME. Es decir, el Bufete pro-metió su lealtad tanto a la ADS como a PRIME.
Según relata el Comisionado, desde abril de 1999 se ha-bía acordado que “para garantizar la transparencia de los *381 procedimientos el querellado no participaría en los asuntos que tuvieran que ver con la facturación”, pero a pesar de esto, el querellado era miembro de la Junta de Directores de PRIME y estuvo en sus reuniones.
El 19 de septiembre de 1999, la Junta de Directores de PRIME acordó que pagaría a una entidad llamada CRV Real Estate Holding la suma de $4,000 mensuales, más utilidades (agua, luz y teléfono) por el alquiler de una pro-piedad en la Urbanización Río Mar, en Río Grande, Puerto Rico. Esta propiedad sería utilizada como oficina y centro de operaciones de PRIME. El 19 de octubre de 1999 se incorporó en el Departamento de Estado la corporación con fines de lucro CRV Real Estate Holding, Inc. De acuerdo con el Comisionado Especial, dicha propiedad había perte-necido al querellado y a su esposa, hasta que la vendieron a CRV Estate Holding, Inc.
Según el Comisionado Especial, todos los servicios pro-fesionales de naturaleza legal que necesitó la ADS en el área ambiental fueron prestados por el Bufete de la misma manera en que ocurría cuando el contrato de servicios en-tre la ADS y el Bufete era directo. La diferencia radicaba en que la facturación del Bufete se hacía a través de PRIME, pero el pago lo hacía la ADS a nombre del Bufete. Durante toda la vida corporativa de PRIME, su único cliente fue la ADS, por lo que todos los ingresos que perci-bió fueron otorgados por esa agencia.
Al concluir su detallado informe, el Comisionado Especial expresó que halló incurso al querellado en violación a los Cánones 21, 37 y 38 del Código de Ética Profesional, supra.
Es norma conocida que le corresponde al Comisionado Especial desempear una función similar al juzgador de ins-tancia, es decir, que éste debe recibir la prueba y dirimir la evidencia conflictiva. En consecuencia, hemos resuelto que sus determinaciones fácticas merecen nuestra mayor deferencia. Por lo tanto, aunque este Tribunal no está obli- *382 gado a aceptar el informe del Comisionado Especial nom-brado para atender una querella contra un abogado —sino que puede adoptar, modificar o rechazar tal informe— de ordinario sostenemos las conclusiones de hecho de un Co-misionado Especial, salvo que se demuestre prejuicio, par-cialidad o error manifiesto. In re Morales Soto, 134 D.P.R. 1012 (1994); In re Moreira Avillán, 147 D.P.R. 78, 86 (1998); In re Soto López, 135 D.P.R. 642 (1994); In re Gordon Menéndez I, 171 D.P.R. 210 (2007).
Sorprende la manera en que la Mayoría ha obviado dichas determinaciones de hecho en este caso, pasando por alto la doctrina que hemos elaborado sobre el trato a los informes de dicho funcionario. Por el contrario, tras efec-tuar un examen exhaustivo del informe rendido por el Co-misionado Especial que nombramos y de la prueba que obra en el expediente, no encuentro razón por la cual de-bamos intervenir con sus determinaciones fácticas.
Aunque concuerdo con la opinión mayoritaria en cuanto a que el querellado no incumplió con el Canon 37 del Código de Ética Profesional, supra, concurro con el Comisio-nado Especial en cuanto a que el querellado sí incurrió en violación a los Cánones 21 y 38, supra. Su conducta laceró la imagen de la abogacía y, en efecto, aparentó impropie-dad y posible conflicto de lealtades al estar su juicio profe-sional influenciado por sus intereses personales en la ges-tión pública y al quedar su lealtad comprometida y fraccionada entre sus intereses pecuniarios, su posición en el Bufete y su deber para con la ADS. Debo reconocer que el querellado, en efecto, cumplió con los requisitos que es-tablecimos jurisprudencialmente en In re Morell, Alcover, 158 D.P.R. 791 (2003), pero según hemos resuelto, el cum-plimiento de esos requisitos no puede ser pro forma, y debe ser evaluado en conjunto con los establecidos en el Canon 38, supra, con el cual el querellado sí incumplió.
*383 II
De acuerdo con el Canon 21 del Código de Etica Profesional, supra, que versa sobre el tema de los intereses encontrados,
[e]l abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las par-tes y con terceras personas, y cualquier interés en la contro-versia que pudiera influir en el cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.
No es propio de un profesional el representar intereses encontrados. Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente.
La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación. Un abogado no debe aceptar la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior ni servir como árbitro, especialmente cuando el cliente anterior le ha hecho confidencias que puedan afectar a uno u otro cliente, aun cuando ambos clientes así lo aprueban. Será altamente impropio de un abogado el utilizar las confi-dencias o secretos de un cliente en perjuicio de éste. (Enfasis nuestro.)
La aspiración general que establece el citado Canon 21 sobre el tema de los intereses encontrados es la lealtad completa que le debe un abogado al cliente y a sus causas. Esta lealtad no es la entrega ciega ni el servilismo, sino la integridad, consistencia y perseverancia en el compromiso del abogado para con los intereses de su cliente. La lealtad que el abogado debe manifestar está fundamentada en los principios básicos de sinceridad, honradez, transparencia y sensatez que caracterizan el buen ejercicio de nuestra pro- *384 fesión y que mantienen la confianza del pueblo en sus ins-tituciones legales.
En el ordenamiento jurídico, el conflicto de intereses o los intereses encontrados constituyen la antítesis del deber de lealtad. Como hemos explicado anteriormente, al exami-nar el tema de los intereses encontrados nos enfrentamos al asunto de las incompatibilidades. En In re Carreras Rovira y Suárez Zayas, 115 D.P.R. 778, 788 (1984), definimos la incompatibilidad en dos acepciones. Expresamos que la incompatibilidad en el orden físico implica “antagonismo, oposición, repugnancia que tiene una cosa para unirse con otra, o dos o más personas entre sí”. En el orden jurídico, la incompatibilidad “se refiere a la imposibilidad legal de si-multanear dos o más cargos, funciones o misiones una misma persona”. íd. Tras prestar esta definición del tér-mino, concluimos que “uno de los requisitos para el ejerci-cio de la abogacía es la compatibilidad de la actuación legal con la situación y circunstancias”. íd.
El abogado debe tener presente que su ministerio radica en su conciencia, y que ésta debe ser libre, independiente y alerta, que le dicte las pautas a seguir para un comporta-miento debido y correcto.(4) Tal y como hemos afirmado, “[l]a premisa es sencilla: quien no sea independiente no está en condiciones de ejercer la profesión”. In re Carreras Rovira y Suárez Zayas, supra, pág. 788, citando a A. Fernández Serrano, De las incompatibilidades para ejercer la abogacía, Madrid, Artes Gráficas M.A.G., S.L., 1952, págs. 5-7. La preservación de la autonomía de juicio del abogado es fundamental para prevenir cualquier tipo de menoscabo a la fidelidad que debe a su cliente.(5) Ramón Mullerat, en su conferencia Las necesidades, los problemas de integración y las respuestas políticas, 67 Rev. Jur. U.P.R. 563 (1998), expuso una definición contemporánea de las profe- *385 siones liberales formulada por el Secretariado Europeo de las Profesiones Liberales:
... la profesión liberal se caracteriza por su competencia, al exigir prestaciones de calidad elevada; interés público, al diri-girse a satisfacer necesidades vitales de los ciudadanos; pres-tación de servicio individual, adaptada a las necesidades del cliente; relación de confianza, de la que se deriva el deber de respetar el secreto profesional; independencia, lo que implica la inexistencia de cualquier género de presión o restricción (in-cluso la que procede de la propia persona que ejerce la profe- ' sión liberal)-, ética profesional; y un nivel elevado en la pres-tación de servicios. (Énfasis en el original suprimido y énfasis nuestro.) Ramón Mullerat, supra, pág. 576.
Las decisiones que hemos emitido sobre este tema tie-nen como cimiento los criterios fundamentales antes expuestos. De acuerdo con nuestra tradición disciplinaria, consecuentemente hemos determinado la existencia de un conflicto de intereses que requiere la imposición de sancio-nes cuando enfrentamos alguna circunstancia que impide que el abogado o la abogada ejerza su función de represen-tación de forma libre y adecuada. In re Belén Trujillo, 126 D.P.R. 743, 752 (1990). El Canon 21, supra, contempla tres situaciones que debe evitar todo abogado para no incurrir en la representación de intereses encontrados, a saber, que en beneficio de un cliente, se abogue por aquello a lo que el letrado debe oponerse en cumplimiento de sus obligaciones para con otro cliente, situación que presupone la represen-tación simultánea de dos clientes distintos cuyos intereses se llegan a oponer; que un abogado acepte la representa-ción de un cliente en asuntos que puedan afectar adversa-mente cualquier interés de un cliente anterior, la cual pre-supone la representación sucesiva de distintos clientes cuyos intereses se llegan a oponer, y que un abogado acepte una representación legal, o que contine en ella, cuando su juicio profesional pueda ser afectado por sus intereses personales. In re Bonilla Rodríguez, 154 D.P.R. 684 (2001).
*386 Estas manifestaciones del conflicto de intereses se pue-den resumir en dos vertientes, una que recoge lo que cons-tituye el conflicto de intereses personales y la más común, que hemos denominado “conflicto de obligaciones”.(6) In re Belén Trujillo, supra, pág. 754. El caso que hoy nos ocupa presenta una controversia relacionada con los conflictos de intereses personales, por lo que nuestra discusión se limi-tará a ese aspecto de la doctrina de intereses encontrados.
Como hemos discutido, el Canon 21 del Cdigo de Etica Profesional, supra, impone un deber de lealtad absoluta que es posible mediante el ejercicio de un juicio independiente. La vertiente de conflicto de intereses perso-nales sostiene que el conflicto existe cuando los intereses personales del abogado interfieren o pueden interferir con la representación adecuada y efectiva del cliente. In re Bonilla Rodríguez, supra, págs. 694-695. En un caso donde se manifieste este tipo de conflicto, el abogado se encuen-tra frente a un dilema, pues su deber de representar al cliente de manera efectiva puede ser incompatible con la defensa de algn interés propio que el abogado también quiera —o tal vez deba— promover o defender. En la ma-yoría de los casos, la representación adecuada conlleva per-judicar los intereses personales del abogado. In re Belén Trujillo, supra, pág. 754; In re Toro Cubergé, supra, pág. 531; Liquilux Gas Corp. v. Berríos, Zaragoza, 138 D.P.R. 850 (1995). Por ello, la prohibición de asumir una repre-sentación legal cuando ésta pueda verse afectada por sus expectativas o intereses personales intenta evitar que un abogado deje de realizar determinada acción de posible be-neficio para su cliente en aras de beneficiarse personalmente. In re Belén Trujillo, supra; In re Pizarro *387 Santiago, 117 D.P.R. 197 (1986); In re Martinez Rivera, 106 D.P.R. 239 (1977); Otaño v. Vélez, 141 D.P.R. 820, 826 (1996); In re Toro Cubergé, supra; In re Palou Bosch, 148 D.P.R. 717, 724 (1999); In re Sepúlveda Girón, 155 D.P.R. 345, 356-357 (2001). Debo aclarar que el referido Canon 21 no solamente veda la representación legal de un cliente respecto al cual el abogado tiene intereses conflictivos so-bre bienes o dinero, sino que se extiende a cualquier tipo de interés encontrado.
El Canon 21 tiene un efecto que hemos calificado como “profiláctico”, pues obliga a todo abogado a evitar un con-flicto entre sus intereses personales y los de su cliente. In re Morell, Alcover, supra, págs. 818-819. Una lectura de la letra del Canon 21, supra, demuestra que la prohibición no sólo se refiere al conflicto de intereses actual, sino al apa-rente, al potencial y al futuro conflicto de intereses, de ma-nera que lo que se proscribe es la posibilidad de un con-flicto de intereses. Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 190 (1985); In re Avilés, Tosado, 157 D.P.R. 867, 871 (2002). En ese sentido, hemos resuelto que
... para imponer al abogado la obligación de renunciar a la representación ... el conflicto no tiene que estar establecido claramente; basta con que el conflicto sea potencial [para que el abogado vulnere la lealtad absoluta que le debe a su cliente]. La situación no varía por el hecho de que alguien crea que dicha posibilidad es, o no, “altamente especulativa”. Fed. Pesc. Playa Picúas v. U.S. Inds., Inc., 135 D.P.R. 303, 319 (1994). Véanse: In re Bonilla Rodrgíuez, supra, págs. 694-695; In re Torres Viera, 171 D.P.R. 443 (2007).
Anteriormente se ha recalcado que la responsabilidad de evitar el conflicto de intereses recae sobre el abogado. In re Palau Bosch, supra. Para determinar el posible conflicto de intereses, el abogado debe evaluar la existencia de cir-cunstancias que llevan consigo la semilla de un posible o potencial conflicto futuro. Es decir, está vedado al abogado asumir la representación legal de clientes cuando resulta razonablemente anticipable un futuro conflicto de intere- *388 ses, aun cuando sea inexistente al momento de la acepta-ción de la representación legal. In re Sepúlveda Girón, supra, págs. 356-357.(7) Así, ante un potencial conflicto de intereses, el deber del abogado es desligarse cuanto antes de la representación profesional que ostenta. In re Torres Viera, supra; In re Roldán González, 113 D.P.R. 238, 242—243 (1982); In re Bonilla Rodríguez, supra, pág. 695. In-cluso, hemos decretado que cuando inadvertidamente el abogado acepte una representación legal conflictiva, éste deberá renunciar de inmediato la representación profesio-nal ante la seal de que los intereses del cliente estén en-contrados con los intereses personales del abogado. In re Sepúlveda Girón, supra, págs. 356-357.
Hemos sido enfáticos en ejercer nuestra función discipli-naria en el contexto de la potencialidad de intereses con-flictivos, pues en la interpretación de una norma de ética sobre la incompatibilidad de un profesional para intervenir en un acto por conflicto de intereses, un tribunal debe te-ner presente que la norma, en su vigencia, no distingue —ni puede distinguir— entre los profesionales quienes en situación de conflicto tienen la fortaleza para resistir la tentación humana de adelantar sus intereses personales, y los débiles de voluntad quienes sucumben en la oportuni-dad pecaminosa. Véase In re Cancio Sifre, 106 D.P.R. 386, 395 (1977).
De acuerdo con el carácter apremiante de nuestro poder fiscalizador ante un posible conflicto de intereses, nuestra intervención podrá ser provocada por los más leves indicios de conducta prohibida. Sabido es que todo miembro de la profesión togada tiene el deber de lucir puro y libre de in-fluencias extrañas a su gestión profesional, y que en el descargo de sus responsabilidades profesionales, debe cui-darse de que sus actuaciones no den margen a la más leve sospecha de que promueve intereses suyos potencialmente *389 encontrados con los de su cliente. In re Pizarro Santiago, supra; In re Roldán González, supra, págs. 242-243; In re Bonilla Rodríguez, supra, pág. 695; In re Palau Bosch, supra; In re Avilés, Tosado, supra, pág. 884; In re Toro Cubergé, supra, pág. 532; In re Morell, Alcover, supra, pág. 811. Por ello, se ha relacionado el deber impuesto por el Canon 38 del Código de Ética Profesional, supra, con el deber impuesto por el Canon 21, supra. In re Torres Viera, supra. En varias ocasiones hemos resuelto que dentro de los parámetros del Canon 21, supra, cobra particular im-portancia el deber de los miembros de la profesión togada de evitar la apariencia de impropiedad en el desempeño de sus funciones profesionales:
En todo caso, hemos de insistir en la importancia de la apa-riencia como elemento importante a ser ponderado y evaluado para despejar incertidumbres de licitud y propiedad. Con este prisma hemos de adentramos en la compleja área ética del conflicto dimanante de intereses encontrados. In re Carreras Rovira y Suárez Zayas, supra, pág. 784.
El Canon 38, supra, dicta las pautas que garantizan la preservación del honor y la dignidad de la profesión:
El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su con-ducta como funcionario del tribunal, deberá interesarse en ha-cer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Tal participación conlleva necesariamente asumir posiciones que puedan resultarle perso-nalmente desagradables pero que redundan en beneficio de la profesión .... (Enfasis nuestro.)
Como foro regulador de la profesión legal, no podemos avalar situaciones de dudas o ambigedad sobre la posibili-dad de intereses encontrados en la gestión profesional de un abogado o una abogada. Por eso, el criterio de aparien-cia de impropiedad debe ser utilizado para resolver las du-das que surjan sobre posible conflicto de intereses. Des- *390 pués de todo, los abogados tenemos la obligación de precaver el conflicto de intereses, tanto en la realidad como en la apariencia. In re Carreras Rovira y Suárez Zayas, supra; In re Rodríguez Torres, 104 D.P.R. 758, 765 (1976); In re Bonilla Rodríguez, supra, pág. 698.
El desempeño de la abogacía requiere en todo momento celo, cuidado y prudencia, pues “ ‘[c]ada abogado es un es-pejo en que se refleja la imagen de la profesión, [por lo que] éstos deben actuar con el más escrupuloso sentido de res-ponsabilidad que impone la función social que ejercen’ ”. In re Fernández de Ruiz, 167 D.P.R. 661, 680 (2006), citando a In re Quiñones Ayala, 165 D.P.R. 138, 533 (2005). Véase In re Gordon Menéndez, supra. Según esos criterios, hemos señalado que “las dudas sobre cuestiones de ética profesio-nal debe resolverlas el abogado con rigurosidad contra sí mismo”. In re Valentín González, 115 D.P.R. 68, 73 (1984). Véanse: In re Carreras Rovira y Suárez Zayas, supra; In re Toro Cubergé, supra, págs. 535-536; In re Belén Trujillo, supra; Sánchez Rodríguez v. López Jiménez, supra; In re Palou Bosch, supra, pág. 725. Este curso de acción no tiene que producirse siempre ante una conducta antiética, pues puede haber situaciones que escapen a la reglamentación y en las que para evitar aun la apariencia de conducta im-propia, el buen juicio aconseje la abstención, aunque ese proceder limite o sacrifique beneficios personales. In re Carreras Rovira y Suárez Zayas, supra, pág. 785.
Cabe reiterar que la apariencia de impropiedad puede ser muy lesiva al respeto de la ciudadanía por sus institu-ciones de justicia y por la confianza que los clientes depo-sitan en sus abogados. Asimismo, la apariencia de con-ducta impropia puede tener un efecto dañino sobre la imagen, la confianza y el respeto del público por su Gobierno, igual que la verdadera impropiedad ética. In re Sepúlveda Girón, supra, pág. 361. Es por eso que los abogados deben asegurarse que su conducta no ha sido influida *391 por intereses encontrados. In re Rojas Lugo, 114 D.P.R. 687 (1983).
Cuando un abogado lleva a cabo una transacción de ne-gocios con su cliente, se impone una auscultación minu-ciosa, pues el deber de lealtad del abogado que comercia con su cliente puede verse disminuido ante una oportuni-dad de lucro personal. Anteriormente hemos resaltado que las transacciones comerciales con un cliente son inherente-mente sospechosas, pues
... no sólo el juicio profesional independiente del abogado puede ser seriamente afectado por sus intereses personales en la transacción, sino que ... [c]ada vez que un abogado realiza una transacción con su cliente, se plantea la posibilidad de que el letrado utilice sus destrezas legales y su posición para aprovecharse del cliente, utilizando, por ejemplo, su influencia o la información confidencial obtenida para su beneficio personal.(8) In re Morell, Alcocer, supra, págs. 805-806.
Este escepticismo nos lleva a escrutar acuciosamente las transacciones entre abogados y clientes para determi-nar si se tratan de transacciones utilizadas por abogados que aprovechan su posición para elaborar esquemas para su propio beneficio y contra los intereses de sus clientes. Morell, Alcocer, supra, págs. 818-819. En el pasado, hemos condenado el que los abogados tomen ventaja de su posi-ción para beneficiarse económicamente. In re Torres Viera, supra; In re Pizarro Santiago, supra. En Nassar Rizek c. Hernández, 123 D.RR. 360, 375 (1989), pusimos de mani-fiesto la fuerza permanente que de ordinario genera el abo-gado frente a su cliente. Los principios éticos de lealtad, decoro, dignidad e integridad profesional del abogado pro-híben que éste se aproveche de esa posición.
Lo anterior es particularmente cierto cuando el cliente *392 es una entidad gubernamental. Hemos declarado lo si-guiente:
Pocas cosas son tan destructivas de la integridad guberna-mental y de la confianza pública en los abogados y en las ins-tituciones de gobierno que la explotación real o aparente de la relación profesional con algún ente del Estado para fines personales. (Enfasis nuestro.) In re Toro Cubergé, supra, pág. 536.
Ante un cuadro como el del caso de autos, debemos rei-terar que este Tribunal reprocha la aparente, posible o real explotación de la relación profesional con una entidad pú-blica para beneficios personales. In re Morell, Alcover, supra, pág. 822. Cuando un abogado que labora para una agencia gubernamental utiliza la información y las in-fluencias de su posición para desarrollar una relación lu-crativa con su cliente, se pone en entredicho la transparen-cia que debe caracterizar la ejecutoria gubernamental en una democracia. Los abogados que representan al interés público tienen la responsabilidad de evitar que su criterio profesional pueda ser afectado por intereses personales. In re Morell, Alcover, supra, pág. 822. Nuestras pasadas ex-presiones han puntualizado la vulnerabilidad que caracte-riza a esta singular relación abogado-cliente.
... los abogados deben ser particularmente cuidadosos en sus labores profesionales y en su relación con la cosa pública, ade-más de ser siempre conscientes de que la fe en la Justicia es uno de los factores determinantes sobre los cuales descansa la convivencia social. In re Toro Cubergé, supra, págs. 535-536.
Precisamente, en In re Toro Cubergé, supra, págs. 532-533, y en In re Morell, Alcover, supra, pág. 807, abordamos este asunto en el contexto de transacciones de negocio en-tre el abogado y una entidad gubernamental. La norma que allí establecimos va dirigida a prohibir, de ordinario, las transacciones comerciales entre un abogado y su cliente, cuando éstas tienen el potencial de afectar el juicio profesional independiente del abogado o cuando éstas pue- *393 dan diluir el deber de lealtad y fidelidad que se le debe al cliente. En ambas ocasiones reconocimos que el conflicto de interés puede surgir, no sólo de la participación personal del abogado en el negocio, sino incluso por virtud de una transacción comercial entre un cliente y una corporación en la que el abogado tuviese un interés o con la que estu-viese relacionada.(9)
El problema central en dichos casos radicó en que los abogados nunca divulgaron a las agencias respectivas que estaban involucrados en las transacciones de negocios de los entes corporativos con los cuales las agencias contrata-ron y en que las agencias no tuvieron la oportunidad de asesorarse independientemente. In re Toro Cubergé, supra, pág. 534. En atención a esto, adoptamos lo dispuesto por la American Bar Association (A.B.A.) en sus reglas modelo de conducta y establecimos los requisitos con los cuales debe cumplir un abogado para orientar debidamente a su cliente, permitirle analizar cabalmente la transacción y brindarle la libertad necesaria para determinar si. accede a ésta. Si bien consideramos que estos requisitos evitan la desinformación del cliente y garantizan su libertad de con-tratación, en In re Morell, Alcover, supra, aclaramos que las pautas establecidas no son meramente requisitos pro forma. Por eso entiendo que el cumplimiento de los requi-sitos pautados en In re Morell, Alcover, supra, no puede evaluarse en abstracto. Por el contrario, debemos ubicarlos en el contexto amplio de nuestro ordenamiento deontoló-gico, pues a fin de cuentas la ética es una en su integridad. In re Cando Sifre, supra, pág. 398. Lo anterior es particu-larmente cierto cuando se refiere a la importancia de evi-tar la apariencia de impropiedad y conflicto en la relación *394 entre el abogado y su cliente cuando éste es una entidad pública.
La naturaleza particular de los hechos que confrontamos en In re Toro Cubergé, supra, y en In re Morell, Alcover, supra, no nos requirió indagar en las distintas impli-caciones de una transacción de negocios entre un abogado y un cliente privado, y las transacciones entre un abogado y su cliente cuando éste es una entidad pública. El cliente del abogado que es contratado por el Gobierno es, en esen-cia, el interés público. Por eso, en esa situación, los intere-ses involucrados tienen una envergadura que va más allá de los confines de la dirección de turno de la agencia. Cuando la transacción es puramente privada, los requisi-tos de divulgación y asesoramiento independiente subsa-nan cualquier desigualdad de información que pueda ha-ber entre el abogado y su cliente. Pero cuando los intereses públicos están de por medio, la apariencia se torna impe-rante, pues lo que está de por medio es la legitimidad misma de nuestro ordenamiento político. El mero cumpli-miento de los requisitos jurisprudenciales antes expuestos no rectifica, ante la ciudadanía, la posible sospecha de una conducta antiética, por lo que el abogado debe tomar me-didas adicionales para mantener la consabida confianza del público en sus instituciones.(10) En fin, los requisitos establecidos por la A.B.A., según mi criterio, no deben apli-carse indistintamente, sino de acuerdo con los intereses involucrados. (11)
*395 Por otra parte, al interpretar el alcance del Canon 21, supra, en cuanto concierne a la relación abogado-cliente, hemos dejado claro que, en nuestro ordenamiento jurídico, “la autonomía del cliente no se extiende al punto de permi-tirle que acepte mediante la manifestación de su consenti-miento voluntario e informado, la representación legal cuando existe alguna posibilidad de conflicto de intereses. ... Nuestro Canon 21 lo prohíbe expresamente”. In re Carreras Rovira y Suárez Zayas, supra, pág. 793.
Además, el Canon 26 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, que versa sobre los derechos y las limita-ciones en la relación con los clientes, dispone que
[n]ingún abogado está obligado a representar a determinado cliente y es su derecho el aceptar o rechazar una representa-ción profesional. ...El abogado debe obedecer siempre su pro-pia conciencia y no la de su cliente. (Énfasis nuestro.)
En Nassar Rizek v. Hernández, supra, págs. 369-370, abundamos sobre la naturaleza del contrato entre el abogado y el cliente, y a la luz de la doctrina vigente explica-mos que, a pesar de que el contrato de asistencia profesio-nal de abogado es una variante del contrato de arrendamiento de servicios plasmado en el Artículo 1434 del Código Civil, 31 L.P.R.A. see. 4013, los tratadistas lo incluyen particularmente dentro de los contratos de pres-tación de servicios propios de las profesiones y de las artes liberales:(12)
De acuerdo con esta visión, el arrendamiento de servicios de una profesión liberal es aquel donde un profesional pone a disposición de la persona una actividad intelectual o técnica retribuida. Su característica principal es la forma autónoma e *396 independiente en pue el profesional, poseedor del título habili-tante, la ejerce. (Enfasis nuestro.)(13)
En consideración a esto y al hecho de que la relación entre abogado y cliente responde en gran medida a las inexorables exigencias éticas, muy particulares de esta profesión, hemos declarado que el contrato de servicios profesionales de abogado constituye un contrato de natu-raleza sui generis. López de Victoria v. Rodríguez, 113 D.P.R. 265, 268 (1982).(14) De esta manera, es definitiva-mente cierto que
[e]stos valores éticos ... operan como elementos limitantes a la voluntad de los contratantes. En este sentido, queda cuali-ficado el principio de libertad y autonomía de las partes con-sagrado en el Art. 1207 del Cdigo Civil, 31 L.P.R.A. see. 3372, respecto de que éstas puedan realizar cualquier convenio siempre y cuando sea conforme a la ley, a la moral y al orden público.
En el contexto de la relación abogado-cliente, el aspecto moral que restringe la libertad de contratación es un poco más sensitivo y abarcador. ...
Esta serie de comportamientos particulares existe en cual-quier etapa de la relación abogado-cliente .... Nassar Rizek v. Hernández, supra, pág. 370.
Como dijéramos en In re Bonilla Rodríguez, supra, pág. 697-698, no podemos permitir el menoscabo al cumpli-miento riguroso de los cánones de ética al condonar la con-ducta del abogado bajo la tesis de que su cliente le man- *397 tiene confianza, pues renunciaríamos y entregaríamos la jurisdicción disciplinaria de este Foro a criterios individua-les, sabios o no, sacrificando intereses públicos de alta calidad.
III
El querellado, anticipando nuestra aplicación de las doctrinas de In re Toro Cubergé, supra, e In re Morrell, Alcover, supra, alega que cumplió con los cánones de ética profesional y con la jurisprudencia interpretativa, pues no utilizó información confidencial de la ADS, divulgó en todo momento la existencia de intereses personales en la tran-sacción, la ADS contó con asesoría legal independiente y la ADS se benefició de una transacción que no fue injusta ni irrazonable. En efecto, el Comisionado Especial reconoció que así fue. No obstante, concluyó —a mi entender correc-tamente— que el mero cumplimiento con las doctrinas de In re Toro Cubergé e In re Morell, Alcover, supra, no fue suficiente.
No podemos pasar por alto el hecho de que el querellado era socio administrador y propietario del Bufete que fungió como representante legal de una agencia gubernamental (la ADS) y que desde que el Bufete comenzó su contrato de servicios profesionales el querellado comenzó a elaborar un esquema corporativo para lucrarse de las necesidades de su cliente (el Plan), basado en el conocimiento obtenido por razón de esa relación profesional. El querellado se encon-traba, sin dudas, en una posición ventajosa para diseñar una entidad que cumpliera a cabalidad con las necesidades de su cliente. Desde antes de la adjudicación del contrato, ya el querellado utilizaba sus influencias como represen-tante legal de la ADS para promover, dentro de las altas esferas del Gobierno, el esquema corporativo que diseñaba. Incluso durante su incumbencia como representante legal de la ADS, formó parte de un comité interno de la agencia *398 que se encargaría de garantizar la continuidad y consisten-cia en la implementación del Plan. Además, el querellado y el personal de su Bufete se reunieron en varias ocasiones con la ADS para discutir los pormenores del Plan y un modelo del contrato que debía firmarse entre la ADS y la entidad que fuera contratada para implementar el Plan. Posteriormente, el Bufete y la ADS celebraron reuniones para hacer viable la propuesta de trabajo que sometió el consorcio del querellado, quien era su accionista mayoritario.
El potencial conflicto de intereses era tan aparente que la misma ADS sugirió que se contratara un abogado ex-terno para negociar los términos del contrato y que el Bu-fete renunciara a la representación legal directa, pues era a la vez asesor legal de la ADS y parte del consorcio. A pesar de que el Bufete en efecto renunció a la representa-ción legal directa, la asumió indirectamente mediante un subcontrato a través de PRIME. Además, consta en los he-chos que el querellado no se abstuvo de participar en el proceso de contratación y negoció importantes cláusulas sobre partidas económicas y servicios. El querellado parti-cipó en el proceso de facturación y fue miembro de la Junta de Directores de PRIME. Además de sus dividendos como accionista mayoritario, el querellado devengaba un sueldo y estipendios para gastos de automóvil y misceláneos. Todo esto apunta a que el querellado no mantuvo la distancia necesaria entre su persona como propietario del Bufete y propietario de PRIME, y su persona como representante legal subcontratado de la ADS, para no dar margen a sos-pechas de intereses encontrados.
Su lealtad quedó fraccionada entre los múltiples roles que desempeñaba. Como miembro del directorio de PRIME, le debía lealtad a ésta y a sus accionistas; como accionista mayoritario de dicha corporación, se lucraba personal-mente; como socio propietario y administrador del Bufete, prometió lealtad a PRIME, y como subcontratista y compo- *399 nente del consorcio, pactó completa lealtad a la ADS. Es indudablemente aparente la potencialidad de un conflicto de intereses.
El hecho de que el querellado no hubiera divulgado se-cretos y confidencias no era justificación para asumir una representación legal posiblemente conflictiva. Ya hemos dicho que un abogado no puede salvar el conflicto de intere-ses aduciendo como justificación que no habrá de utilizar las confidencias o secretos de un cliente en perjuicio de éste. In re Carreras Rovira y Suárez Zayas, supra, pág. 784. Tampoco exime al querellado de responsabilidad el hecho de que la información de la ADS no fuera confiden-cial, pues la información la recibió de primera mano por ser el asesor legal de dicha agencia, lo que como mínimo crea la apariencia de que se aprovechó de su posición para ejercer influencias y crear un consorcio a la medida de las necesidades de la ADS. Esta apariencia aporta al detri-mento de la confianza de la ciudadanía en su Gobierno y en nuestro ordenamiento jurídico. Avalar esta conducta le-siona de igual manera la confianza del público en nuestra ejecutoria.
Tampoco libera de responsabilidad al querellado el ha-ber cumplido con su deber de divulgar al cliente las cir-cunstancias de su relación, como requiere la doctrina adop-tada en In re Morell, Alcover, supra. El abogado es dueño de su propia conciencia y es su deber indelegable cumplir con los cánones de su profesión. Como indiqué, la jurispru-dencia es clara al establecer que la autonomía de la liber-tad en materia de contrato de servicios profesionales entre abogado y cliente está ceñida por la deontología. Cuando el Gobierno es el cliente, el abogado debe ir más allá del cum-plimiento pro forma de unos requisitos jurisprudenciales, y debe evaluar si el acto que pretende llevar a cabo lleva consigo la apariencia de impropiedad.(15) Un cliente no *400 puede consentir a que su representante lesione los postu-lados que rigen su profesión y actúe de manera aparente-mente impropia.
Este Tribunal ha desaprovechado la oportunidad que le brinda este caso para interpretar el Canon 21, supra, en el contexto de contratos con entidades gubernamentales. Aunque entiendo que en ese contexto la conducta del que-rellado violó el Canon 21, supra, no habiéndose pautado anteriormente la naturaleza particular de ese contrato ni las consideraciones éticas que lo rigen, aplicaría la norma-tiva propuesta de manera prospectiva y no penalizaría al querellado por su incumplimiento. No obstante, de acuerdo con los hechos expuestos y a una interpretación conjunta de los Cánones 21 y 38, supra, resolvería que el querellado incurrió en una conducta que creó la apariencia de impro-piedad al levantar las sospechas de un posible conflicto de intereses, y censuraría enérgicamente al Ledo. Carlos Rivera Vicente por su incumplimiento con el Canon 38 del Código de Etica Profesional, supra.

 En casos de conducta profesional resulta ser singularmente importante emi-tir decisiones consistentes con nuestras determinaciones anteriores. Ello es así, por-que al decidir este Tribunal de determinada manera, en cierta situación fáctica, crea en los abogados la impresión de que nuestra postura será la misma en situaciones sustancialmente similares. In re Silva Iglecia, 162 D.P.R. 105 (2004).

 En el 2001, luego del cambio en la administración gubernamental, se nombró un grupo de ciudadanos bajo el nombre de “Blue Ribbon Committee” con la enco-mienda de fiscalizar la ejecutoria de la administración anterior, en particular la contratación gubernamental que se llevó a cabo como parte de una política publica de privatización. Este grupo refirió la controversia de autos, tanto al Procurador General como al Contralor. Este último también presentó una querella contra el licenciado Rivera Vicente el 19 de febrero de 2004.

 El Procurador General imputó unas infracciones al Preámbulo del Código de Etica Profesional y su jurisprudencia interpretativa, y a los Cánones 37, 21, 18 y 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.

 In re Carreras Rovira y Suárez Zayas, 115 D.P.R. 778, 795 (1984).

 Íd., pág. 789.

8) Existe un conflicto de obligación cuando hay representaciones simultáneas o sucesivas de clientes en las que los intereses de éstos están en conflicto con el deber de guardar confidencias que tiene el abogado con cada uno. En estos casos el abogado se enfrenta ante otro posible dilema: por un lado, tiene con cada uno de sus clientes el deber de guardar confidencias y de representarlo adecuadamente, y por otro, la representación adecuada de un cliente posterior o simultáneo puede requerir la divulgación de confidencias del otro. In re Belén Trujillo, 126 D.P.R. 743, 754 (1990).

 En In re Concepción Suárez, 111 D.P.R. 486 (1981), requerimos la renuncia de un abogado por existir una posibilidad de conflicto de intereses.

 Nótese que nuestra preocupación no se limita a la divulgación o uso de información confidencial.

 “La ficción legal que tipifica la corporación como persona jurídica distinta de sus accionistas ... no [es suficiente] para satisfacer la norma sobre incompatibilidad .... La ética es una en su integridad, indemne al fraccionamiento que en ley separa la corporación de su accionista.” In re Cando Sifre, 106 D.P.R. 386, 398 (1977).

 A manera de guía, podemos establecer una analogía entre los mecanismos que debe seguir el abogado que representa al Gobierno y las protecciones que la Asamblea Legislativa ha elaborado en la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico para mantener una apariencia de conducta ética. En sus Artículos 3.3 y 3.7, esta ley establece unos períodos de tiempo como medidas profilácticas para evitar el posible conflicto de intereses personales. Si bien no pro-pongo que estas disposiciones legales apliquen directamente al abogado de la prác-tica privada que es contratado por el Gobierno para llevar a cabo determinadas funciones públicas, sí pueden servir de guía para los abogados en situaciones como la de autos. Véase 3 L.P.R.A. sees. 1823 y 1827(b).

 Véase M.C. Ramos de Szendrey, Conducta Profesional, 66 Rev. Jur. U.P.R. 551 (1997), en especial la discusión que la autora expone en las páginas 562-567 sobre las implicaciones del caso In re Toro Cubergé, 140 D.P.R. 523 (1996).

 Para formular nuestra postura, nos nutrimos del trabajo de J. Castán Tobeñas, Derecho Civil español, común y foral, 12ma ed., Madrid, Ed. Reus, 1985, T. 4, pág. 466; J. Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, pág. 430; M. Albaladejo, Comentarios al Código Civil y compila-ciones forales, Madrid, Ed. Rev. Der. Privado, 1986, T. XX, Vol. 2, pág. 1 et seq.; M. Albaladejo, Derecho Civil, 7ma ed., Barcelona, Librería Bosch, 1983, T. II, Vol. 1, pág. 281.

 M. Albaladejo, Comentarios al Código Civil y compilaciones forales, op. cit., pág. 27.

 En cuanto a la influencia de la ótica en la relación contractual del abogado y su cliente, dijimos:
“El contrato se encuentra inmerso en normas deontológicas [que] impregnan la relación contractual en abono de un interés público superior que puede trascender el interés exclusivo de las partes. Como observa acertadamente Adolfo E. Parry, las leyes reglamentarias de la profesión de abogado ‘participan del carácter de las de orden público, desde que reposan en concepciones consideradas por el Legislador como esenciales a la existencia de la sociedad: garantizar ... la competencia y probidad de un servicio público auxiliar de la administración de la justicia’. Ética de la Abogacía, Buenos Aires, Ed. Jurídica Argentina, 1940, T. 1, pág. 16" Nassar Rizek v. Hernández, 123 D.P.R. 360, 370 (1989).

 Hay jurisdicciones estatales en Estados Unidos que han concluido que cuando el interés público está involucrado, un abogado no puede representar al *400 cliente cuando hay conflicto de intereses, aun cuando éste consienta. In re A. and B., 209 A.2d 101 (1965); Graf v. Frame, 352 S.E.2d 31 (W. Va. 1986); State ex rel. Morgan Stanley v. MacQueen, 416 S.E.2d 55 (W. Va. 1992); Ahto v. Weaver, 189 A.2d 27 (1963); City of Little Rock v. Cash, 644 S.W.2d 229 (Ark. 1982).