*In re* EDWIN W. BELÉN TRUJILLO, querellado.

*Número:* CE-88-195 *Resuelto:* 29 de junio de 1990

---

746

*Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General, Iván F. Fuster y Ricardo E. Alegría Pons, Procuradores Generales Auxiliares,* abogados de El Pueblo; *Rubén Rivera Ramos,* abogado del querellado; *Vicente López Pérez,* Comisionado Especial.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Esta investigación disciplinaria nos permite pronunciarnos sobre el alcance del Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, que regula el conflicto suscitado entre los intereses personales del abogado y la representación adecuada de sus clientes. Evaluado el informe del Comisionado Especial sobre los conflictos de intereses del abogado querellado, procede la imposición de sanciones disciplinarias.

I

En septiembre de 1985 se publicó en el periódico *El Nuevo Día* un anuncio que informaba que en la Universidad Católica de Cuenca en Ecuador (Universidad) había cupo para estudiantes puertorriqueños interesados en estudiar medicina e invitaba a todos los interesados a comunicarse con el Instituto Andino de

Estudios Superiores (Instituto Andino)(1) para obtener más información. Los querellantes, estudiantes de medicina, llamaron al número de teléfono provisto que resultó ser el de la oficina del licenciado Belén Trujillo. A cada uno se le citó a una entrevista con el Presidente del Instituto Andino en la oficina del licenciado Belén Trujillo.

En la entrevista se orientó a los estudiantes sobre el costo de matrícula ($6,800 anuales),(2) la forma de pagarla y los requisitos de admisión a la institución. Además, cada estudiante tenía que pagar $300 por concepto de hospedaje y $500 por los boletos de avión. También se les requirió $75 como depósito para procesar la admisión. El Instituto Andino se encargaría de las gestiones necesarias para que se concediera la visa y el pasaporte a los estudiantes.

Concluida la entrevista, cada estudiante firmó un documento titulado "Aceptación" donde el licenciado Belén Trujillo, en su carácter de Presidente del Instituto Andino, certificó que el solicitante había sido admitido a cursar estudios de medicina en la Universidad.(3)

---

(1) El Instituto Andino de Estudios Superiores (Instituto Andino) es una corporación con fines de lucro organizada bajo las leyes del Estado Libre Asociado de Puerto Rico.

Su junta de directores estaba compuesta por el Lcdo. Edwin W. Belén Trujillo, el querellado, como su presidente; el Sr. Miguel A. Álvarez Souffront como vicepresidente ejecutivo; el Sr. Víctor Barroso Palacios como secretario, y el Sr. Julio Castro Febo como tesorero y agente residente. La Srta. Rita García era la secretaria del Instituto Andino.

(2) El costo de la matrícula para cualquier estudiante de medicina extranjero en la Universidad Católica de Cuenca era de $675. Si el estudiante era ecuatoriano, solamente pagaba $195 por concepto de matrícula.

Para sufragar los costos de matrícula, los estudiantes aceptados tramitaban un préstamo de estudiantes por $5,000 y otorgaban un pagaré al portador por $1,000. Los pagarés estaban en poder del Instituto Andino.

(3) En la aceptación firmada por el estudiante Luis A. Soto Alicea aparece el sello notarial del licenciado Belén Trujillo. El querellado explicó que esto se debió a una inadvertencia de su parte porque ese documento no llevaba sello notarial alguno.

Entre la Universidad Católica de Cuenca (Universidad) y el Instituto Andino había un acuerdo donde la Universidad autorizaba al Instituto a "recibir en Puerto Rico inscripciones y documentos personales de los Interesados (sic) en cursar estudios en el Ecuador, además en forma obligatoria deberá el Doctor Edwin Belén Trujillo obtener y presentar autorización legal de los estudiantes para la realización de la gestión de matrícula, que se hará con sujeción a las disposiciones reglamentarias y estatutarias de la Universidad Católica de Cuenca, Ecuador. Apéndice 2, pág. 17.

Cada estudiante también firmó una "Autorización Legal" donde se facultaba al querellado a realizar todas las gestiones encaminadas a lograr la matrícula en la Universidad. El documento designaba al querellado como "[el] *Representante Legal a todos los efectos legales pertinentes, ya sea para la gestión de la matrícula así como cualquiera otra gestión necesaria y relacionada con [el] ingreso y permanencia [del estudiante] en la Universidad. . .* ". (Énfasis suplido.) *Exhibit* IV del P.G. Estipulado. Todas las autorizaciones legales fueron juramentadas ante la notario Lcda. Neida Luz Otero Concepción en su oficina localizada en el mismo edificio donde está la oficina del querellado.

Un mes después de la entrevista inicial, el 19 de octubre de 1985, el licenciado Belén Trujillo y el grupo de estudiantes partieron hacia Ecuador para iniciar sus estudios. Luego de algunos percances con la línea aérea por el exceso de equipaje,(4) llegaron a Quito, donde supuestamente el Instituto tendría una persona esperándolos en el aeropuerto. Sin embargo, en realidad nadie los esperaba. Consiguieron transportación y llegaron a Cuenca el 21 de octubre a las tres de la madrugada.

Ese mismo día, cerca de las 11:00 A.M., el querellado y todos los estudiantes se dirigieron hacia la Universidad para iniciar los trámites de matrícula. Allí se reunieron con el señor Montesinos, ayudante del decano de la facultad de medicina. Durante la reunión surgió un problema con aquellos estudiantes que ya tenían estudios previos en medicina pero que no tenían las acreditaciones correspondientes. Estos pretendían que se les colocara en el año de estudios que les correspondía al acreditárseles todos los cursos tomados en otras universidades.

Debido a que no había ningún documento que evidenciara la aprobación de los referidos créditos, la universidad les ofreció la

---

El Instituto se comprometió a ofrecer una beca a un estudiante ecuatoriano por cada estudiante puertorriqueño matriculado y a sufragar los gastos de seminarios, profesores visitantes, etc. Por su parte, la universidad no podía aceptar ni matricular a los estudiantes puertorriqueños que no hicieran la gestión a través del Instituto Andino.

(4) En el vuelo de Caracas a Quito, Ecuador, la línea aérea cobró $1,023 por exceso de equipaje. Se hizo una colecta entre los estudiantes y estos aportaron $400. El resto fue pagado por el licenciado Belén Trujillo.

alternativa de matricular a todos los estudiantes en primer año, y a aquellos que tuviesen estudios previos se les daría exámenes para ubicarlos en el año correspondiente. Los estudiantes concernidos no aceptaron la alternativa y alegaron que el querellado les había prometido que se les convalidarían los créditos tomados en otras universidades. El licenciado Belén Trujillo negó lo expresado por los estudiantes y arguyó que él no podía violentar las normas de la institución.

Ese mismo día, a eso de las 8:00 P.M., se reunieron en el hotel el licenciado Belén Trujillo y todos los estudiantes. Éstos le informaron que habían decidido renunciar al Instituto y exigieron sus expedientes. El querellado se los entregó. Sin embargo, un grupo de los estudiantes le informó al licenciado Belén Trujillo su deseo de estudiar en la universidad. Éste se comprometió a hablar con el decano de la facultad de medicina para que se les acreditara el primer año de estudios en medicina por el bachillerato en ciencias que habían completado.

Ese mismo día el licenciado Belén Trujillo se querelló en el hotel porque le habían robado $9,600 en efectivo. Las autoridades de inmigración investigaron el asunto y, luego de entrevistar a los estudiantes, calificaron el hurto de "auto-robo". A sugerencias de las autoridades, el licenciado Belén Trujillo se mudó a otro hotel.

Con el propósito de concretar el acuerdo final entre el Instituto Andino y la Universidad, el querellado se reunió con el Dr. Nelson Córdova, abogado de la Universidad. Al iniciarse la reunión, el doctor Córdova le informó al licenciado Belén Trujillo que la estudiante Sonia M. Santini le imputaba al querellado haberse apropiado del monto de los préstamos estudiantiles que ascendía a $100,000. Para continuar con las negociaciones, el doctor Córdova exigió al licenciado Belén Trujillo un documento firmado por todos los estudiantes donde se aclarara la situación. Los estudiantes no accedieron a firmar el documento y alegaron que se trataba de un asunto de la señorita Santini y el padre de ésta, quien había hecho las gestiones desde Puerto Rico.

En vista de que los estudiantes se negaron a suscribir el relevo solicitado, el querellado canceló la reunión pautada con el

doctor Córdova y renunció a la representación de los estudiantes afectados. Al día siguiente se trasladó a Quito, junto a su hijo, para visitar unos familiares.

Mientras tanto, los estudiantes que habían permanecido en Cuenca instaron una denuncia contra el licenciado Belén Trujillo y el señor Vaca, representante del Instituto Andino en Cuenca, en la que alegaron falsificación de documentos de la Universidad y apropiación del dinero de los préstamos.

El querellado fue arrestado y estuvo confinado en Quito una semana hasta que se comprobó que no hubo ninguna falsificación de documentos de la Universidad. El licenciado Belén Trujillo se comprometió a producir una carta del banco que acreditara que él no se había apropiado del dinero de los préstamos. Eventualmente consiguió una certificación del banco a esos efectos.

Los estudiantes hicieron llegar a las autoridades de inmigración la orden de arresto original y el licenciado Belén Trujillo volvió a ser encarcelado al día siguiente. En esta ocasión estuvo detenido por tres (3) días.

Con el transcurso de los días, la situación de los estudiantes se tornó severamente precaria. El pasaje que habían adquirido a precio especial tenía una fecha prefijada de regreso. La visa que habían obtenido era de estudiantes y, de no matricularse, estaban ilegalmente en el país. Se realizaron varias gestiones con las autoridades gubernamentales en Puerto Rico para facilitar el regreso de los estudiantes. Finalmente, estos regresaron a Puerto Rico gracias a las gestiones hechas por las autoridades consulares norteamericanas.

El licenciado Belén Trujillo regresó a Puerto Rico el 25 de noviembre por la noche. Al día siguiente, el Sr. Miguel Álvarez, vicepresidente del Instituto Andino, le informó que ambos estaban citados para acudir a la Fiscalía de Bayamón. Los estudiantes habían denunciado al licenciado Belén Trujillo y al señor Álvarez

por apropiación ilegal agravada. No se determinó causa probable contra ellos.(5)

Finalmente, algunos de los estudiantes presentaron querellas ante este Tribunal contra el licenciado Belén Trujillo. Luego de recibida su comparecencia y sometido el informe del Procurador General, le ordenamos que presentara cargos contra el licenciado Belén Trujillo. Designamos al Lcdo. Vicente López Pérez como Comisionado Especial. Tenemos el beneficio del informe del Comisionado. Procedemos a resolver al amparo del Canon 21 del Código de Ética Profesional, *supra*.

## II

El conflicto de intereses regulado por el Canon 21 del Código de Ética Profesional, *supra*, parte de la premisa que todo abogado tiene un deber de "lealtad completa" con su cliente.

El abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el cliente al seleccionar su consejero. *Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.*

*No es propio de un profesional el representar intereses encontrados.* Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente.

La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación. Un abogado no debe aceptar la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior ni servir

---

(5) El Instituto Andino y su junta de directores demandaron a los estudiantes por los sucesos acontecidos. Reclamaron sumas millonarias por los alegados daños sufridos. Este pleito fue desestimado por inactividad.

Actualmente en la Universidad hay cinco (5) estudiantes puertorriqueños cursando estudios de medicina.

como árbitro, especialmente cuando el cliente anterior le ha hecho confidencias que puedan afectar a uno u otro cliente, aun cuando ambos clientes así lo aprueban. Será altamente impropio de un abogado el utilizar las confidencias o secretos de un cliente en perjuicio de éste. (Énfasis suplido.) Véase *García O'Neill v. Cruz*, 126 D.P.R. 518 (1990), y casos allí citados.

■ Tradicionalmente se ha determinado la existencia de un conflicto de intereses que requiere la imposición de sanciones disciplinarias cuando hay alguna circunstancia que impide la representación libre y adecuada por parte del abogado y vulnera la lealtad absoluta que le debe todo abogado a su cliente. Véanse, en general: R.A. Gorlin, *Codes of Professional Responsibility*, Washington, D.C., The Bureau of National Affairs, 1986, págs. 52–57; G. Hazard y D. Rhode, *The Legal Profession: Responsibility and Regulation*, Nueva York, Ed. Foundation Press, 1985, pág. 247 y ss.

■ Dentro de esta definición general de conflicto de intereses, se manifiestan dos (2) posibles vertientes: aquella denominada propiamente "conflicto de intereses personales", y aquella conocida como "conflicto de obligaciones". En su primera dimensión, existe un conflicto cuando los intereses personales del abogado imposibilitan la representación adecuada del cliente, al chocar con el deber de lealtad hacia éste. En un caso donde se manifieste este tipo de conflicto, el abogado está frente a un dilema: su deber de representar al cliente de manera efectiva puede ser incompatible con la defensa de sus propios intereses. Cuando esto ocurre, la representación adecuada conlleva, en la mayoría de los casos, perjudicar los intereses personales del abogado.(6) K. Kipnis, *Conflict of Interest and Conflict of*

---

(6) En K. Kipnis se establece,

"Without the attorney knowing about it, a personal interest in the matter may compromise an attorney's ability to exercise independent professional judgment on behalf of a client. Standing to benefit from specific advice or representation, the attorney also has an interest in underestimating the degree to which advantage to self may interfere with the fulfillment of obligations to the client. And so for many —perhaps for all— it may be ethically imprudent to trust one's own opinion that professional judgment will be

*Obligation,* en M. Davis y F. Elliston, *Ethics and the Legal Profession,* Nueva York, Prometheus Book, 1986, págs. 283–298. K. Kipnis, *Legal Ethics,* Nueva Jersey, Ed. Prentice Hall, 1986, pág. 40 *et seq.*

■ Por otro lado, existe un conflicto de obligación cuando hay representaciones simultáneas o sucesivas de clientes donde los intereses de éstos están en conflicto con el deber de guardar confidencias que tiene el abogado con cada uno. En estos casos el abogado se enfrenta ante otro posible dilema: por un lado tiene con cada uno de sus clientes el deber de guardar confidencias y de representarlo adecuadamente y, por otro, la representación adecuada de un cliente posterior o simultáneo puede requerir la divulgación de confidencias del otro. En estos casos, "[a]nte el asomo razonable de posibles conflictos[,] debe declinar representar a ambos simultáneamente" —*Ortiz v. Soliván Miranda,* 120 D.P.R. 568, 572 (1988)— o al cliente posterior (*In re Concepción Suárez,* 111 D.P.R. 486 (1981)). Véase *Conflicts of Interests in the Legal Profession,* 94 Harv. L. Rev. 1243, 1292–1310 (1981).

■ Del lenguaje del propio Canon 21 del Código de Ética Profesional, *supra,* se desprende que están expuestos en sus dos (2) vertientes tanto el conflicto de intereses personales como el conflicto de obligaciones, y que se requiere la existencia de una relación abogado-cliente. La ausencia de ésta no permite la imposición de sanciones disciplinarias por violación al citado Canon 21.

■ La relación abogado-cliente es una relación sui géneris que responde en gran medida a las inexorables exigencias éticas muy particulares de esta profesión. *López de Victoria v. Rodríguez,* 113 D.P.R. 265 (1982). Ésta se funda en el deber de lealtad y de confidencialidad de todo abogado para con su cliente. Canon 21 del Código de Ética Profesional, *supra.*

---

unaffected by personal interest." *Conflict of Interest and Conflict of Obligation* en M. Davis y F. Elliston, *Ethics and the Legal Profession,* Nueva York, Prometheus Book, 1986, pág. 293.

■ Los tratadistas y la jurisprudencia norteamericana, al analizar la naturaleza de la relación abogado-cliente, llegaron a la conclusión de que se trataba de una variedad de agencia donde el cliente es el principal y el abogado es el agente. *Brinkley v. Farmers Elevator Mutual Insurance Co.*, 485 F.2d 1283 (10mo Cir. 1973); *Olfe v. Gordon*, 286 N.W.2d 573 (1980). Sin embargo, muy pronto fue evidente que era difícil enmarcar este tipo de relación en el concepto de agencia porque las implicaciones se extendían más allá de lo esperado en una relación agente-principal. Véase, en general, L.R. Patterson, *Legal Ethics: The Law of Professional Responsibility*, Nueva York, Ed. Matthew Bender, 1984, pág. 41 *et seq.*

■ Confrontada con esta situación, la doctrina moderna ha definido la relación abogado-cliente como una relación múltiple, compuesta de las diferentes funciones que desempeña un abogado. Cada una de éstas crea una relación abogado-cliente diferente y particular con un grado de responsabilidad variable.

■ El abogado puede desempeñarse como consejero, intermediario, defensor, auditor legal, legislador privado y negociador. "De estas funciones, las más comunes son las de defensor y consejero y a ellas responden los códigos de ética. De hecho, la función de consejero y defensor son la base del deber de lealtad en un sistema adversativo de la administración de la justicia y han delineado los contornos de la relación abogado-cliente. La función de consejero es la justificación del deber de confidencialidad, el cliente necesita estar seguro de que existe una relación confidencial para poder revelar aquella información necesaria para obtener un buen consejo legal. La función de defensor en la litigación es la justificación primordial al deber de evitar los conflictos de intereses." (Traducción nuestra.) Patterson, *op. cit.*, pág. 413.

■ Conscientes de esta multiplicidad de tareas, la *American Bar Association* ha promulgado un reglamento modelo que toma en consideración los distintos tipos de conflictos que

surgen entre abogados y clientes. Véase *Annotated Model Rules of Professional Conduct*, Reglas 1.1 a 1.9. (1984).

■ Sin embargo, tanto en el proyecto de la *American Bar Association* como en nuestros cánones, es esencial distinguir entre la relación abogado-cliente sujeta a los respectivos reglamentos y las otras actividades que con frecuencia los abogados llevan a cabo y que no están relacionadas con su práctica profesional. Recuérdese que un .abogado puede dedicarse a actividades ajenas a su profesión y que nuestra jurisdicción disciplinaria no se extiende a este ámbito a menos que se realice con "el fin directo o indirecto de proporcionarle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido". Canon 37 del Código de Ética Profesional, *supra; In re Roldán Figueroa*, 106 D.P.R. 4 (1977); *In re Clavell Ruiz*, 106 D.P.R. 257 (1977).

■ En todas nuestras decisiones anteriores donde, por un conflicto de intereses, hemos impuesto una sanción disciplinaria al amparo del Canon 21, *supra*, ha existido una relación abogado-cliente. Véanse: *In re Pizarro Santiago*, 117 D.P.R. 197 (1986); *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778 (1984); *In re Rojas Lugo*, 114 D.P.R. 687 (1983); *In re Roldán González*, 113 D.P.R. 238 (1982); *In re Concepción Suárez*, supra; *In re Martínez Rivera*, 106 D.P.R. 239 (1977). No obstante, hemos hecho manifestaciones sobre la necesidad de evitar conflictos de intereses potenciales. *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 190 (1985).

■ Por esta razón, es imprescindible determinar inicialmente si existe una relación abogado-cliente. Ésta comienza cuando el cliente acude al abogado a requerir sus servicios profesionales para que lo asesore o lo represente en un asunto jurídico.

■ La protección de los cánones de ética también se extiende a aquellas ocasiones en que la persona acude al abogado para que éste le brinde ayuda legal y, por cualquier razón, no se

perfecciona la relación entre ambos. En este caso de relación "imperfecta" el abogado tiene la obligación de guardar las confidencias del cliente.

## III

En el caso de autos, la prueba revela que los estudiantes designaron al licenciado Belén Trujillo como su representante legal y creyeron de buena fe que él era su abogado.

El hecho de que la representación fuese en un asunto que en esa etapa no era un problema jurídico y que el licenciado Belén Trujillo no estaba admitido al ejercicio de la profesión en Ecuador, no es óbice para que no existiera una relación abogado-cliente. Recuérdese que el abogado, dentro de su gestión profesional, puede desempeñar varias funciones que no necesariamente acarrean la representación en los tribunales.

En la situación planteada, el licenciado Belén Trujillo actuó como representante legal de los estudiantes y como Presidente del Instituto Andino. También fungió como representante en Puerto Rico de la Universidad y actuó como mediador entre los estudiantes y esa institución. Su conflicto de intereses era múltiple. Tenía que velar por los intereses de los estudiantes, que eran sus representados, y además tenía que proteger sus propios intereses por ser el Presidente del Instituto Andino. El querellado no podía enfrentarse a las autoridades universitarias en busca de una solución adecuada para los estudiantes porque una acción de tal naturaleza podía representar el deterioro de las relaciones entre la Universidad y el Instituto Andino, con la inevitable consecuencia de la disolución del acuerdo de exclusividad logrado entre las partes.

Varias circunstancias abonan a la conclusión a que hemos llegado. En primer lugar, los estudiantes acudieron a la oficina de abogado del querellado a gestionar los trámites de matrícula. Así quedó demostrado que no existía ninguna independencia entre la gestión de abogado que realizaba el querellado y las gestiones

realizadas como Presidente del Instituto Andino. Al existir esta confusión de servicios, los estudiantes confiaron en que la gestión que iba a realizar el licenciado Belén Trujillo iba a tener éxito, precisamente por la profesión del querellado, y que en caso de dificultades el licenciado Belén Trujillo los representaría adecuadamente.

En segundo lugar, existe un documento firmado por el querellado donde expresamente se señala que el licenciado Belén Trujillo sería el representante legal de los estudiantes. Aunque dicha frase podría interpretarse como que el querellado era el único mandatario autorizado a realizar la gestión, los hechos ante nos apuntan a una conclusión en contrario. Tenemos que recordar que aquí no se trata de un cliente conocedor del derecho, con experiencia en el trato con abogados, sino de unos jóvenes estudiantes interesados en estudiar medicina en el extranjero y fácilmente influenciables por una persona con acceso a una institución profesional que ofreciera un título en esa profesión. Cualquier persona razonable también hubiera interpretado la frase "representante legal" como sinónimo de abogado y hubiera confiado en éste para su admisión a una escuela de medicina en el extranjero.

No hay duda que el licenciado Belén Trujillo incurrió en graves conflictos de intereses al sostener relaciones profesionales simultáneas que contravinieron no sólo sus intereses personales, sino también sus obligaciones con las distintas partes que representaba. El conflicto entre sus intereses personales y los de los estudiantes, el Instituto Andino y la Universidad es un ejemplo manifiesto de la falta de deber de lealtad para con los clientes, la cual proscribe el Canon 21 del Código de Ética Profesional, *supra*. De igual forma, el querellado incurrió en responsabilidad ética al no declinar la representación de sus clientes ante el asomo razonable de conflictos obligacionales. *Ortiz v. Soliván Miranda*, supra.

En estas circunstancias, *procede suspender al licenciado Belén Trujillo del ejercicio de la abogacía por un término de un (1) año con seis (6) meses.*

*Se dictará sentencia de conformidad.*