EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re: Pedro Santiago Ríos | 2008 TSPR 2 173 DPR ____ |
|---|---|

Número del Caso: CP-2005-8

Fecha: 18 de diciembre de 2007

Abogado de la Parte Querellada:

Lcdo. Hermes F. Acevedo Lebrón

Oficina del Procurador General:

Lcdo. Salvador J. Antonetti Stutts
Procurador General

Lcda. Mariana Negrón Vargas
Lcda. Maite D. Oronoz Rodríguez
Subprocuradora General

Lcda. Miriam Soto Contreras
Procuradora General Auxiliar

Materia: Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

INTEGRACION DE SALA

ORDEN

San Juan, Puerto Rico, a 18 de diciembre de 2007.

Debido a la no intervención del Juez Asociado señor Rebollo López y la Jueza Asociada señora Rodríguez Rodríguez, se constituye una Sala Especial integrada por el Juez Presidente señor Hernández Denton, el Juez Asociado señor Rivera Pérez y la Juez Asociada señora Fiol Matta, para entender y disponer del caso CP_2005-8 In re: Pedro Santiago Ríos.

Lo decretó y firma.

Federico Hernández Denton
Juez Presidente

Certifico:

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In Re:

Pedro Santiago Ríos                    CP-2005-8

SALA ESPECIAL INTEGRADA POR EL JUEZ PRESIDENTE SEÑOR HERNANDEZ DENTON, EL JUEZ ASOCIADO SEÑOR RIVERA PEREZ Y LA JUEZA ASOCIADA SEÑORA FIOL MATTA.

PER CURIAM

San Juan, Puerto Rico, a 18 de diciembre de 2007.

El licenciado Pedro Santiago Ríos, en adelante licenciado Santiago Ríos, fue admitido al ejercicio de la profesión de la abogacía en el año 1975. El presente procedimiento disciplinario plantea la formulación de una serie de cargos por conducta alegadamente violatoria a los Cánones 21, 37, y 38 del Código de Ética Profesional.

I

El 19 de febrero de 2004, el Contralor de Puerto Rico, Honorable Manuel Díaz Saldaña, en

adelante el Contralor, presentó una queja juramentada ante el Tribunal Supremo de Puerto Rico contra el licenciado Carlos Rivera Vicente, socio propietario del Bufete Cancio Nadal, Rivera, Díaz y Berrios, en adelante CNRD&B y el licenciado Pedro Santiago Ríos, socio a cargo de la División de Derecho Ambiental de CNRD&B. En síntesis, alegó que ambos abogados incurrieron aparentemente en conducta constitutiva de violación a los Cánones 21, 37, y 38 del Código de Ética Profesional[1]. Los hechos que dieron origen a la queja presentada, surgieron de la auditoría que el Contralor realizó a la Autoridad de Desperdicios Sólidos, en adelante ADS, agencia a la cual CNRD&B ofrecía sus servicios legales. El 3 de junio de 2004, copia del expediente de la queja presentada por el Contralor fue remitida a la Oficina del Procurador General para la correspondiente investigación e informe. En vista de que, contra el licenciado Carlos Rivera Vicente ya existía un procedimiento disciplinario sobre los mismos hechos, se presentó una moción para bifurcar las quejas, a los fines de atenderlas por separado. Dicha moción fue declarada Con Lugar el 17 de diciembre de 2004.

Posteriormente, la Procuradora General Auxiliar, licenciada Miriam Soto Contreras, conforme a la investigación realizada presentó una querella juramentada contra el licenciado Santiago Ríos. En la misma alegó que **el querellado se apartó de los exigentes postulados que disponen los Cánones 21, 37 y 38 de Ética Profesional,***supra*. El 14 de marzo de 2006, el Procurador General y la representación legal del licenciado Santiago Ríos, presentaron ante el

[1] 4 L.P.R.A, Ap,IX, C. 21,37,38.

Comisionado Especial, un informe de conferencia con antelación a vista en su fondo. Dicho documento, unido a un informe suplementario presentado con fecha de 24 de mayo de 2006, constituyeron la base para las determinaciones del informe del Comisionado Especial. En síntesis, **el Comisionado Especial concluyó que, en las circunstancias presentes y en función de la conducta desplegada por el licenciado Santiago Ríos, sólo procedía imputarle una violación al Canon 38 del Código de Ética Profesional,** *supra*.

Con el beneficio de dichos documentos y teniendo en cuenta que la trayectoria profesional del licenciado Santiago Ríos fue estipulada por las partes procedemos a evaluar los cargos imputados. En vista de que la alegada conducta imputada surge en ocasión de su puesto como Presidente de *Puerto Rico Infraestructura Management Group, Inc.,* en adelante PRIME, expondremos la génesis de dicha Corporación y la relación existente entre ésta última, el bufete CNRD&B y ADS. Veamos.

II

El licenciado Pedro Santiago Ríos, en adelante licenciado Santiago Ríos, obtuvo en el 1961, el grado de Ingeniería Química del Colegio de Agricultura y Artes Mecánicas de Mayagüez, actual Recinto Universitario de Mayagüez, Universidad de Puerto Rico. En el 1963, luego de licenciarse del ejército, ocupó varias posiciones en la *Commonwealth Oil and Refining Company, Inc.,* también conocida como CORCO, tales como, Ingeniero de Procesos, Director de Área de petroquímicas y Gerente General de las plantas petroquímicas.

El 20 de mayo de 1975 fue admitido al ejercicio de la profesión de la abogacía. A partir de esa fecha se trasladó

al Departamento Corporativo de Leyes de la CORCO, donde laboró hasta su renuncia en el 1992. En enero de 1992, comenzó a trabajar como abogado del bufete CNRD&B, donde dirigió la División de Derecho Ambiental.  A principios de 1994, ADS contrató al bufete CNRD&B para recibir asesoría legal, principalmente en el área administrativa y ambiental. En particular, CNRD&B atendió lo relativo a un plan de infraestructura regional para reciclaje y disposición de desperdicios sólidos en Puerto Rico, en adelante el Plan. No obstante, CNRD&B no tuvo ingerencia en la elaboración del PLAN.  La implementación de dicho Plan correspondía a ADS y tenía como objetivo incorporar estrategias y tecnologías recientes para la disposición de los desperdicios sólidos en Puerto Rico.[2]  El Plan respondía a una exigencia de la *United States Enviromental Protection Agency*, conocida por sus siglas como EPA, ante un inminente cierre de los vertederos en Puerto Rico.  Para estas fechas el licenciado Santiago Ríos ocupaba el puesto de Director de la División de Derecho Ambiental de CNRD&B y como tal, mantuvo una participación activa en la discusión, desarrollo e implementación de los proyectos de ADS desde el bufete CNRD&B.

Durante la vigencia de dichos contratos, CNRD&B presentó a ADS el concepto de *Integrated Services Partnership Group, Inc,* también denominado como el Consorcio. Este concepto fue creado por el licenciado Carlos Rivera Vicente, en adelante

---

[2] El 19 de abril de 1998 mediante Orden Ejecutiva # 18, el Honorable Pedro Roselló, entonces Gobernador de Puerto Rico, elevó el Plan a política pública. El 15 de enero de 1999, mediante resolución # 99-02, suscrita por el Ingeniero Daniel Pagán, Secretario del Departamento de Recursos Naturales y Ambientales, creó el Plan de Infraestructura regional para reciclaje y disposición de desperdicios sólidos de Puerto Rico.

licenciado Rivera Vicente, entonces socio propietario del bufete CNRD&B, y el mismo tenía como propósito atender las agendas y proyectos complejos en el sector público y privado. Específicamente, el Consorcio pretendía aglutinar varias entidades de modo tal que, una vez contratadas prestasen los servicios de forma multidisciplinaria para colaborar con la implementación del Plan. Cabe destacar que, **el Consorcio, fue la génesis de PRIME, corporación con fines de lucro creada por el licenciado Rivera Vicente e incorporada el 16 de octubre de 1998**.[3] Dicha corporación se creó como un organismo integrador de servicios y tenía a su cargo coordinar la gerencia de los proyectos de infraestructura del Plan, entre ADS y los expertos contratados para el mismo. Es en este momento que el licenciado Santiago Ríos renunció a CNRD&B, para ocupar el puesto de Presidente de PRIME, conforme a la oferta hecha por el licenciado Rivera Vicente.

El 18 de septiembre de 1998, el licenciado Rivera Vicente, le hizo una propuesta a la ADS para la implementación del PLAN a través de PRIME.[4] Después de evaluar varias ofertas, ADS contrató los servicios de PRIME. En vista de ello, las partes se reunieron y comenzaron a elaborar un contrato denominado *"Management Assistance Service Agreement"*, en adelante contrato MASA. No obstante, durante el proceso de preparación del contrato MASA, la licenciada Marie Code, Directora de la División Legal de ADS,

---

[3] El licenciado Rivera Vicente era el accionista mayoritario de dicha corporación en un 75% y el doctor Manuel Morales recibía un 25% de las acciones emitidas. Ambos eran quienes designaban la Junta de Directores de PRIME.

[4] No obstante, entre los años 1996 y 1997, el concepto se presentó además de ADS, a varias agencias de gobierno tales como Turismo, el Departamento de Salud, Banco Gubernamental de Fomento, entre otras.

planteó a CNRD&B, la existencia de un posible conflicto de intereses y específicamente, manifestó su preocupación en torno al rol de PRIME, los servicios que éste brindaría a ADS, y cómo trabajarían juntos. Por tal motivo, PRIME contrató una representación legal ajena a CNRD&B, para atender lo referente al contrato entre ambos.[5] Además para evitar mayores preocupaciones, CNRD&B terminó el contrato de servicios profesionales que tenía con ADS.

El 15 de enero de 1999, se firmó el contrato entre PRIME y ADS.[6] En la otorgación del contrato MASA concurrieron las partes siguientes: ADS estuvo representado por su Directora Ejecutiva, la Ingeniera Roxana Longoria Ferrer; el Departamento de Recursos Naturales representado por su Secretario, el Ingeniero Daniel Pagán Rosa y la Corporación PRIME, representada por su Presidente el licenciado Santiago Ríos. Por acuerdo entre las partes, se dispuso que la

---

[5] El contrato entre PRIME y ADS estuvo a cargo del licenciado Carlos Ruiz Cox, bajo la dirección del licenciado Santiago Ríos y de la licenciada Marie Code de ADS.

[6] Mediante este contrato se propició la privatización de gran parte de las áreas técnicas, operacionales y legales de ADS. En el contrato MASA se certificó que PRIME no tenía ningún conflicto de interés o de política pública con ADS. En atención a ello, se incluyó entre sus cláusulas el establecimiento de un *Permanent Joint Executive Comitee*, con el propósito de tener un mecanismo para discutir asuntos de envergadura que afectaran la implementación del Plan y para que la ADS fiscalizara directamente el contrato de servicios profesionales entre ADS y PRIME. Además, en el referido contrato, se acordó que en la subcontratación a ser realizada por PRIME, se establecería que los subcontratistas estarían igualmente obligados al cumplimiento de las disposiciones del contrato MASA en cuanto aplicara a sus respectivos servicios.

División Legal de ADS tendría a su cargo la revisión y ajustes a las facturas de CNRD&B por los servicios realizados en lo relativo al Plan.

Una vez constituido el contrato entre ADS y PRIME, el licenciado Rivera Vicente, mediante misiva dirigida al licenciado Santiago Ríos, le ofreció los servicios de asesoría legal de CNDR&B, para la implementación del Plan. **<u>PRIME aceptó la oferta y el 23 de marzo de 1999 se suscribió el contrato entre PRIME y CNRD&B</u>**.

No obstante, desacuerdos en los ajustes realizados en las facturas de CNRD&B, provocaron que el licenciado Santiago Ríos suscribiera una carta a la División legal de ADS en la que solicitó que se reconociera lo facturado por CNRD&B.[7] ADS entendió que la reacción del licenciado Santiago Ríos constituyó una postura favorable para CNDR&B y contraria a los intereses de ADS.

Es a la luz de los hechos expuestos que el Procurador General, en su querella contra el licenciado Santiago Ríos, le imputó la violación a los Cánones 21, 37 y 38 del Código

---

[7] La carta fue suscrita el 7 de octubre de 1999 y entre otras cosas expresaba lo siguiente:

> … El ajuste drástico de las facturas se ha convertido en la norma y no en la excepción, a nuestro juicio, por causas ajenas a nuestra voluntad y fuera de nuestro control. Ejemplo de ello es que ha sido la propia ADS quien ha requerido los servicios de CNRD&B, a través de PRIME. La prudencia exige que la determinación de la ADS sea en unión a PRIME con la asistencia del subscribiente. De ser necesario estamos en la mejor disposición de asistir a la ADS en la recopilación de toda la información indispensable que evite esta problemática. En última instancia, la repetición de este patrón de conducta no favorece los mejores intereses de ninguna de las partes y en forma alguna promueve el adelanto de los proyectos de infraestructura, lo cual es nuestra meta común….

de Ética Profesional, *supra*. Particularizó la conducta violatoria del modo siguiente:

> **"Fungir como abogado del Bufete Cancio Nadal, Rivera, Díaz y Berrios, el cual tuvo varios contratos de servicios con la ADS y bufete donde dirigió la División Ambiental, participando conjuntamente, con el Lcdo. Carlos Rivera Vicente, socio propietario del mismo, en la creación de una corporación con la información obtenida mediante su relación profesional con ADS que implementaría el plan de manejo de desperdicios sólidos en la Isla."**

> **"Cesar funciones en el bufete e inmediatamente convertirse en Presidente de PRIME."**

> **"Subcontratar, en representación de PRIME, al mismo bufete donde había trabajado anteriormente, como los asesores legales de PRIME, particularmente en la implementación del contrato entre dicha Corporación (PRIME) y ADS."**

> **"Beneficiar y favorecer al bufete, por encima y en contravención a los mejores intereses de la ADS, instrumentalidad a la cual a fin de cuentas, le respondía y se debía PRIME."**

Sin embargo, el Comisionado Especial, luego de evaluar la prueba presentada, las estipulaciones de las partes y los hechos que dieron lugar a la formulación de su querella concluyó lo siguiente:

En lo que respecta al **Canon 21** del Código de Ética Profesional, *supra*:

> "Consideramos que no existe evidencia que demuestre que existió una **relación de abogado – cliente** entre el querellado y PRIME, el querellado y ADS luego de que éste fuera designado como Presidente de PRIME."

En cuanto a la violación al **Canon 37** del Código de Ética Profesional, *supra*:

> "De las estipulaciones presentadas por las partes surge, sin lugar a dudas, que el licenciado Santiago Ríos tiene una preparación académica y profesional que le habilitaba para ser considerado para presidir PRIME. En ausencia de evidencia en contrario, lo más razonable es concluir que el querellado era un candidato

idóneo para ser nombrado Presidente de PRIME y la consideración para su nombramiento fue esa."

"No existe evidencia de que el querellado actuara como abogado y ejecutivo de PRIME de manera simultánea en algún momento, agenciándose beneficios por su participación o generando para sí trabajo profesional lucrativo. El Canon 37 a nuestro juicio no es de aplicación."

En cuanto a la violación al **Canon 38** del Código de Ética Profesional, *supra*:

"Argumenta el Procurador General que es violatorio al Canon 38 beneficiarse de información obtenida mediante su relación profesional con ADS, cesar sus funciones en el bufete e inmediatamente convertirse en Presidente de PRIME. Señala además, el Procurador General, como violación al Canon 37, subcontratar con el mismo bufete donde había trabajado anteriormente, beneficiando a su anterior patrono, en contravención a los mejores intereses de ADS, instrumentalidad a la que respondía ADS."

"Por su parte, el querellado entiende que no violó el Canon 38 ya que no se evidenció perjuicio contra nadie o lucro personal a su favor."

"Sin embargo, el enfoque que la prensa del país le dio a este asunto, así como los cuestionamientos públicos que de manera reiterada se suscitaron, tienen un innegable efecto en la imagen de la profesión legal."

"Consideramos que se violó el Canon 38 pero en grados de intensidad atenuados, siendo la lesión a la imagen de la profesión legal mínima."

III

En atención a las violaciones imputadas, procedemos a evaluar lo que contempla el Canon 21 del Código de Ética Profesional, *supra*, en adelante Canon 21, el cual dispone lo siguiente:

"El abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el

cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales."

**"No es propio de un profesional el representar intereses encontrados. Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente."**

"La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación. Un abogado no debe aceptar la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior ni servir como árbitro, especialmente cuando el cliente anterior le ha hecho confidencias que puedan afectar a uno u otro cliente, aún cuando ambos clientes así lo aprueben. Será altamente impropio de un abogado el utilizar las confidencias o secretos de un cliente en perjuicio de éste." (Énfasis suplido.)

El conflicto de intereses dispuesto en el Canon 21 presenta tres situaciones que deben ser evitadas por todo abogado: (1) que en beneficio de un cliente se **abogue por aquello a lo que el letrado debe oponerse** en cumplimiento de sus obligaciones para con otro cliente; (2) que un abogado acepte la **representación de un cliente** en asuntos que puedan afectarse adversamente cualquier interés de un cliente anterior; y (3) que un abogado acepte una representación legal, o que continúe en ella, cuando su juicio profesional pueda ser afectado por sus **intereses personales.** De este modo se pretende evitar conducta profesional que mine el principio cardinal de confianza en que debe fundamentarse toda relación fiduciaria entre un abogado y su cliente.[8] La relación

---

[8] *In re* Avilés Cordero,Tosado Arocho, 157 D.P.R. 867, 882 (2002); *In re* Sepúlveda Girón, 155 D.P.R. 345; 355 (2001). *Véase*, además, *In re* Toro Cubergé, 140 D.P.R. 523 (1996).

abogado-cliente es una de naturaleza fiduciaria y está fundada en la honradez absoluta. [9] Asimismo, se funda en el deber de lealtad y de confidencialidad de todo abogado para con su cliente. [10]

El abogado tiene la obligación de representar a su cliente con total lealtad, ejercer un criterio profesional independiente y desligado de sus propios intereses, no divulgar los secretos y confidencias que el cliente haya compartido durante el transcurso de sus representaciones pasadas y presentes. [11] En consecuencia, los abogados no sólo deben evitar el conflicto de intereses actual, sino también el potencial. [12] Basta con que el conflicto sea uno potencial, para imponer al abogado la obligación de renunciar a la representación del cliente afectado. [13] La situación no varía por el hecho de que alguien crea que dicha posibilidad es, o no, altamente especulativa. [14]

El Canon 21 abarca, además, el conflicto de intereses por la representación múltiple y la representación sucesiva de clientes. La representación sucesiva de clientes con intereses adversos, presenta el peligro especial de que el

---

[9] *In re* Dennis Vélez Barlucea, 152 D.P.R. 298,309 (2000); *In re* Belén Trujillo, 126 D.P.R. 743, 754-755 (1990); *In re* Pereira Esteves, 131 D.P.R. 515 (1992); *In re* Rivera Carmona, 114 D.P.R. 390 (1983).

[10] *In re* Avilés Cordero, Tosado Arocho*, supra.*

[11] *In re* Dennis Vélez Barlucea, *supra*; Liquilux Gas Corp. v Berrios, Zaragoza, 138 D.P.R. 850, 857-858 (1995); Robles Sanabria, Ex parte, 133 D.P.R. 739 (1993).

[12] *In re* Angel S. Bonilla Rodríguez, 154 D.P.R. 684, 694 (2001).

[13] *Íd.*

[14] *Íd.*; Fed. Pesc. Playa Picúas v. U.S. Inds., Inc, 135 D.P.R. 303, 319 (1994).

abogado viole el principio de la confidencialidad,[15] privilegio que subsiste aún luego de finalizada dicha representación.[16] **Para determinar si existe un conflicto por representación sucesiva, se tiene que demostrar una relación sustancial o adversa entre la controversia legal en la que el abogado comparece actualmente en su contra y la materia o causa de acción en la que dicho abogado representó inicialmente**. Sin embargo, el criterio de relación sustancial no requiere probar una violación actual al principio de confidencialidad por lo que cobija cualquier violación potencial dentro del marco de dicha relación.[17]  Es decir, basta probar que la controversia en el pleito actual está relacionada sustancialmente con la materia o causa de acción anterior.[18]

Como vemos, el conflicto de intereses proscrito por el Canon 21 comprende tanto el conflicto de intereses personales como el conflicto de obligaciones. La primera vertiente sostiene que el conflicto existe cuando los intereses personales del abogado interfieren con la representación adecuada y efectiva del cliente, al ser éstos incompatibles entre sí; dificultando de este modo, el deber de lealtad hacia su cliente.[19] En su segunda acepción, el conflicto de obligaciones existe cuando las representaciones simultáneas o sucesivas están en conflicto con su deber de guardar

---

[15] *In re* Carreras Rovira y Suárez, 115 D.P.R. 778 (1984)

[16] *In re* Guzmán, 80 D.P.R. 713 (1958).

[17] *In re* Carreras Rovira y Suárez Zayas, 115 D.P.R. 778 (1984).

[18] Otaño Cuevas v. Vélez Santiago, 141 D.P.R. 820 (1996).
[19] *In re* Belén Trujillo, *supra*. Véase además *In re* Angel S. Bonilla Rodríguez, *supra*.

confidencias que ostenta el abogado con cada uno de sus clientes.[20]

Es deber de todo abogado cerciorarse de que no represente intereses encontrados o incompatibles entre sí.[21] Además, el abogado tiene que cuidarse de que sus actuaciones no den margen a la más leve sospecha de que promueve o defiende intereses encontrados con los de su cliente.[22] En caso de que surja alguna sospecha, es deber del abogado desligarse de la representación profesional que ostenta.[23] De este modo, se garantiza la más completa independencia de su juicio por parte de los abogados al desempeñar funciones profesionales y se evita que se erosione la confianza pública en las instituciones de justicia.[24]

Es importante señalar que, la prohibición sobre conflicto de intereses requiere **la existencia de una relación de abogado-cliente dual**.[25] De ser así, se debe determinar si ello implica representar intereses encontrados o incompatibles,[26] o que puedan serlo potencialmente.[27] En consecuencia, es imprescindible determinar **<u>inicialmente si existe una relación abogado-cliente</u>**. Esto lo hemos reiterado en decisiones

---

[20] *In re* Rivera Vicente, 2007 T.S.P.R. 189, 172 D.P.R. ___ (2007).

[21] *Íd.*

[22] *In re* Roldán González, 113 D.P.R. 238, 242-243 (1982).

[23] *Íd.*

[24] *In re* Palou Bosch, 148 D.P.R. 717, 725 (1999).

[25] *In re* Soto Cardona, 143 D.P.R. 50 (1997).
[26] *In re* Pizarro Santiago, 117 D.P.R. 197 (1986).

[27] Sánchez Rodríguez v. López Jiménez, 16 D.P.R. 172 (1985).

anteriores donde, por un conflicto de intereses, hemos impuesto una sanción disciplinaria al amparo del Canon 21.[28]

La relación abogado-cliente es una relación *sui generis* que responde en gran medida a las inexorables exigencias éticas de esta profesión.[29] La doctrina moderna define la relación abogado-cliente como una relación múltiple, compuesta de las diferentes funciones que desempeña un abogado. Cada una de estas funciones crea una relación abogado-cliente diferente y particular con un grado de responsabilidad variable.[30] El abogado puede desempeñarse como consejero, intermediario, defensor, auditor, legislador privado y negociador. No obstante, ésta relación comienza cuando el cliente acude al abogado a requerir sus servicios profesionales para que lo **asesore** o le **represente** en algún asunto.[31]

El Procurador General alegó en su querella que la conducta del licenciado Santiago Ríos generó una situación de conflicto de intereses. Aduce, principalmente, que la misma se constituyó cuando luego de cesar sus funciones en el bufete CNDR&B, fungió como Presidente de PRIME y subcontrató al mismo bufete donde había trabajado anteriormente, como los asesores legales de PRIME. No le asiste razón.

El Procurador General y la representación legal del licenciado Santiago Ríos, en el informe de conferencia con

---

[28] *In re* Pizarro Santiago, *supra*; *In re* Carreras Rovira y Suárez Zayas, *supra*; *In re* Rojas Lugo, 114 D.P.R. 687 (1983); *In re* Roldán González, *supra*; *In re* Concepción Suárez, 111 D.P.R. 486 (1981); *In re* Martínez Rivera, 106 D.P.R. 239 (1977).

[29] López de Victoria v. Rodríguez, 113 D.P.R. 265 (1982).

[30] *Íd.*

[31] *In re* Belén Trujillo, *supra*.

antelación a la vista en su fondo, estipularon que una vez el licenciado Santiago Ríos renunció a CNRD&B, **dejó de fungir como abogado, y que como Presidente de PRIME sus funciones eran gerenciales**. Hecho que fue aceptado por el Procurador General.

Las estipulaciones de hechos contenidas en el informe de conferencia con antelación al juicio, sobre las cuales no existe controversia alguna, evidencian que en ningún momento fungió como abogado de PRIME. Es menester señalar que, el deber de lealtad exigido profesionalmente a los abogados en el Canon 21, se quebranta cuando se **representan intereses encontrados** o se entremezclan intereses personales, con aquellos **sustancialmente relacionados con el ministerio de la representación legal**. Según expresamos antes, es esencial distinguir entre la relación abogado-cliente y las otras actividades que con frecuencia los abogados desempeñan. Conforme a ello, para ejercer nuestra jurisdicción disciplinaria, la conducta en cuestión tiene que desarrollarse dentro de una relación que haya adquirido la naturaleza de abogado-cliente.

Coincidimos con el criterio del Comisionado Especial, el cual expresó que el licenciado Santiago Ríos, actuó tanto al contratar con ADS, como al aceptar los servicios profesionales de CNRD&B, en su carácter de Presidente de PRIME. Es razonable concluir que, la preparación académica de un ingeniero químico, como tal, era altamente beneficiosa para cumplir con los propósitos de la corporación PRIME. En vista de ello, el licenciado Santiago Ríos, aceptó, como bien podía hacerlo, el nombramiento que se le hizo. Desde el momento que decidió ocupar dicho puesto, éste renunció a

CNDR&B y dejó de ofrecer sus **servicios legales** a todas las partes en cuestión, razón por la cual, no era su deber abogar en calidad de letrado en beneficio de un cliente, por aquello a lo que debía oponerse en cumplimiento de sus obligaciones como abogado para con otro cliente. Más aún, de los hechos presentados no surgió evidencia de que PRIME tuviese una División Legal atendida por el licenciado Santiago Ríos.

Conforme a lo anterior, y reiterando el criterio de que el Comisionado Especial designado por el Tribunal Supremo en un caso disciplinario, está en mejor posición de aquilatar la prueba presentada, concedemos deferencia a la determinación de que no se violó en la situación de hechos aquí presente el Canon 21. Encontramos que en este aspecto, las determinaciones de hechos, estuvieron sostenidas por la evidencia presentada en el expediente.

IV

En cuanto al **Canon 37** de Ética Profesional, *supra*, en adelante, Canon 37, se dispone lo siguiente:

> "La participación del abogado en negocios o actividades de venta de bienes, agencias de cobro, fianzas u otros servicios comerciales propios o pertenecientes a otras personas no es una actividad propia de la buena práctica de la profesión **si tal negocio o actividad tiene el fin directo o indirecto de proporcionarle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido.**" (Énfasis suplido.)

Dicho canon prohíbe que un abogado se dedique ya sea, directa o indirectamente al negocio de fianzas, ni a ninguna otra actividad que fuere incompatible con el ejercicio de la profesión.[32] Preceptúa que no es una actividad propia de la buena práctica de la profesión, la participación de un

---

[32] *In re* Clavell Ruiz, 108 D.P.R. 259 (1978).

abogado en negocios o actividades de venta de bienes u otros servicios comerciales propios o pertenecientes a otras personas, **si tal negocio o actividad tiene el fin directo o indirecto de proporcionarle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido**.[33]  Ahora bien, si el negocio **no genera servicios legales adicionales para el abogado,** no existe tal violación.  A tenor con lo anterior, en *In re Ramírez Ferrer*[34] determinamos que un abogado que fungía como agente de una casa hipotecaria y no prestaba servicios legales no incurría en violación del Canon 37.

Por otro lado, la situación actual presenta cada vez más, como un hecho palpable, el que una persona posea más de una título académico.  Debido a ello, el profesional en cuestión, está legítimamente habilitado para desempeñar, con entera libertad, cualquiera de las profesiones para las cuales está capacitado. Consciente de la pluralidad de funciones que desempeña un abogado, la *American Bar Association* promulgó un reglamento modelo, en el que considera los distintos tipos de conflictos que surgen entre los abogados y sus clientes.[35] Sin embargo, tanto en el referido reglamento como en nuestros Cánones de Ética Profesional, es esencial distinguir entre la relación abogado-cliente y el desempeño del abogado en otra profesión ajena al ejercicio de la abogacía.[36] Por ende, un abogado puede libremente dedicarse a actividades ajenas a su profesión siempre y cuando no realice dicha actividad <u>con el</u>

---

[33] *In re Rivera Vicente, supra*; *In re Roldán Figueroa*, 106 D.P.R. 4 (1977).
[34] 147 D.P.R. 607 (1999).

[35] *In re Belén Trujillo, supra,* citando *Annotated Model Rules of Professional Conduct,* Rules 1.1 a 1.9. (1984).

[36] *In re Belén Trujillo, supra.*

fin directo o indirecto de proporcionarle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido.[37]

De la evidencia presentada y conforme a las estipulaciones de hechos realizadas por las partes no surge que el licenciado Santiago Ríos haya utilizado su puesto de Presidente de PRIME con el fin directo o indirecto de proporcionarse trabajo profesional lucrativo que de otra forma no hubiese obtenido.[38] Cabe señalar que surge de las estipulaciones de hechos que el licenciado Santiago Ríos no participó en la formación de la corporación PRIME y que renunció al bufete CNRD&B antes de ocupar el puesto como Presidente de dicha corporación. Así pues, al contratar con ADS, era a ésta a quien, en última instancia, rendía sus servicios.

El Procurador General sostiene en su querella, que el licenciado Santiago Ríos advino en conocimiento de la disponibilidad del puesto de Presidente de PRIME mientras era abogado de CNRD&B. De tal hecho, no se presentó evidencia alguna que el licenciado fungiera como **abogado y ejecutivo de PRIME de manera simultánea** en algún momento, agenciándose beneficios por su participación como Presidente de PRIME. Además, hay que señalar que, el criterio a utilizarse en un proceso disciplinario, es el de prueba clara, robusta y convincente,[39] no afectada por reglas de exclusión ni a base de conjeturas.[40] Se requiere una carga probatoria más acuciosa que la mera preponderancia de la prueba, toda vez

---

[37] *In re* Rivera Vicente, *supra*; *In re* Roldán Figueroa, 106 D.P.R. 4 (1977); *In re* Clavell Ruiz, 106 D.P.R. 257 (1977).
[38] *In re* Rodríguez Mercado, 2005 TSPR 144; 165 DPR ____ 2005.

[39] *In re* Pizarro Santiago, *supra*.

[40] *In re* Caratini Alvarado, 153 D.P.R. 575 (2001).

que en estos procesos está en juego el título de un abogado y, por ende, su derecho fundamental a ganarse su sustento.[41]

En vista de lo anterior, resolvemos que no se ofreció evidencia que nos permita concluir que el licenciado Santiago Ríos violó el Canon 37.

V

El Canon 38 de Ética Profesional, *supra*, en adelante, Canon 38, entre otras cosas, dispone lo siguiente:

"El abogado deberá esforzarse, al máximo de su capacidad, en la **exaltación del honor y dignidad de su profesión**, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia…"[42] (Énfasis suplido.)

"Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable."

La práctica de la abogacía está revestida de un alto interés público la cual requiere de una estricta observancia y reglamentación.[43] Distinto quizás a otras profesiones, dicha práctica conlleva una seria y delicada función ciudadana pues la misma representa servicio, ética y ejemplo.[44] Por ello, al interpretar este canon hemos señalado que la apariencia de conducta impropia puede resultar muy perniciosa al respeto de

---

[41] *Íd.*

[42] 4 L.P.R.A. Ap. IX C. 38.

[43] *In re* Negrón Negrón, 163 D.P.R. ____, 2005 T.S.P.R 5.

[44] *In re* Cuyar Fernandez, 163 D.P.R. _____, 2004 T.S.P.R. 164; *In re* Cintrón Colón, 161 D.P.R. _____, 2004 T.S.P.R. 73; Ramos Acevedo v. Tribunal Superior, 133 D.P.R. 599, 613 (1993).

la ciudadanía por sus instituciones de justicia y por la confianza que los clientes depositan en sus abogados.[45]

En repetidas ocasiones, este Tribunal ha advertido que por ser los abogados el espejo donde se refleja la imagen de la profesión, éstos deben actuar con el más escrupuloso sentido de responsabilidad que impone la función social que ejercen.[46] El abogado tiene el deber de lucir puro y libre de influencias extrañas a su gestión profesional, y en el descargo de sus responsabilidades profesionales, debe cuidar que sus actuaciones no den margen a la más leve sospecha de que promueve intereses suyos encontrados con los de su cliente.[47] Ello implica que todo abogado tiene el deber de desempeñarse con dignidad y alto sentido del honor y aunque ello conlleve ciertos sacrificios personales, deberá conducirse en forma digna y honorable, tanto en la vida privada como en el desempeño de su profesión.[48] Es conveniente recordar, que el deber de comportarse conforme al Canon 38, aplica tanto dentro como fuera de la profesión. En otras palabras, un abogado que actúe de manera impropia no podrá justificar su conducta aduciendo que no se relaciona con la profesión de la abogacía.[49]

---

[45] *In re* Rivera Vicente, *supra*; *In re* Fernández de Ruiz, 167 D.P.R. ____; 2006 T.S.P.R 73.

[46] *In re* Ortiz Brunet, 152 D.P.R. 542, 556 (2000); *In re* Silvagnoli Collazo,154 D.P.R. 533.

[47] *In re* Morell, Alcover, 158 D.P.R. 791 (2003).

[48] *In re* Quiñones Ayala, 164 D.P.R. ___, 2005 T.S.P.R. 99.

[49] *In re* Peña Peña, 153 D.P.R. 642 (2001); *In re* Astacio Caraballo, 149 D.P.R. 790 (1999); *In re* Belk Arce y Serapión, 148 D.P.R 685 (1999); *In re* Martínez y Odell, 148 D.P.R 49 (1999); *In re* Ramírez Ferrer, 147 D.P.R. 607 (1999); *In re* Rivera Cintrón, 114 D.P.R. 481, 491 (1983); Colegio de Abogados v. Barney, 109 D.P.R 845 (1980).

El Procurador General en la querella contra el licenciado Santiago Ríos, argumentó que la conducta violatoria al Canon 38 se configuró cuando al cesar como abogado de CNRD&B, aceptó el puesto de Presidente de PRIME. Expresó además, que se apartó de las exigencias del Canon 38 al subcontratar el mismo bufete donde había trabajado anteriormente.[50] Asimismo, sostuvo que la carta que suscribió el licenciado Santiago Ríos, en reacción a un desacuerdo con la revisión de una factura enviada por ADS, dio la apariencia de que el licenciado Santiago Ríos asumió una posición favorable al bufete CNRD&B y perjudicial a ADS. No coincidimos con ese criterio.

La carta cursada por el licenciado Santiago Ríos, aún cuando en efecto fue una reacción a los ajustes realizados en las facturas, manifestaba la disposición de asistir a ADS en la recopilación de la información necesaria para aclarar dicha problemática. Además, de una lectura integral de la misma, se desprende el interés por resolver la controversia

---

[50] Cabe señalar que, en *In re* Rivera Vicente, *supra*, atendimos la relación contractual entre PRIME y el bufete CNRD&B, a los fines de resolver si tal actuación, colocó al licenciado Rivera Vicente en un conflicto o potencial conflicto entre su deber de lealtad hacia ADS y las obligaciones asumidas con PRIME como subcontratistas. A esos efectos, citando a *In re* Semidey Morales, 151 D.P.R. 842 (2000), expresamos que "conviene tener en mente que el Canon 21 contempla que un abogado sea contratado por un tercero para ofrecerle servicios legales a determinado cliente y que incluso, sea ese tercero quien pague sus honorarios. En tales casos, el cliente es la persona cuyo interés representa el abogado, aunque haya sido un intermediario quien contrató con él". Consecuentemente, resolvimos que "la relación abogado-cliente conlleva que el abogado despliegue completa lealtad hacia su cliente y que la relación de CNRD&B con PRIME también suponía cierto grado de lealtad. **Nada en el expediente indica que ambas exigencias fueran incompatibles**". … "Además, en previsión a cualquier conflicto potencial y en cumplimiento con las pautas establecidas en el Canon 21, *supra,* **las partes acordaron que el bufete nunca representaría legalmente a PRIME.**"

en aras de favorecer los mejores intereses de todas las partes y consiguientemente promover el mejor desarrollo del Plan. Cabe destacar, además, que como Presidente de PRIME, el licenciado Santiago Ríos podía mostrar un interés legítimo en asegurarse de que las entidades subcontratadas por el Consorcio no enfrentaran inconvenientes a la hora de cobrar sus servicios.

Por su parte, el Comisionado Especial expresó que la proximidad del licenciado Santiago Ríos con el bufete CNRD&B pudo haber ocasionado algún grado de suspicacia o recelo en el público en general, lesionando así la imagen de la profesión legal.  No obstante, en lo que respecta a este asunto, el Comisionado Especial en su informe expresó  que **"la prueba estipulada no aporta información mayor que nos permita concluir con rotundidad sobre este aspecto, razón por la cual dejamos de sobre-extendernos"**. La conducta imputada ha de ser aquella que realmente le haga indigno de pertenecer a este foro. A esos fines, se debe analizar si la conducta imputada realmente afecta las condiciones morales del abogado.

Por lo tanto, con los hechos aquí presentes no es razonable concluir que la conducta desplegada por el querellado, atentó contra la comunidad o contra la profesión en general.

VI

En virtud de los fundamentos que preceden, concluimos que, la conducta desplegada por el licenciado Santiago Ríos no constituyó una violación a los Cánones 21 y 37, ni revistió la gravedad que contempla el Canon 38 de Ética Profesional, *supra*. Por tanto, declaramos Sin Lugar la

querella presentada en su contra y ordenamos el archivo del asunto.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Pedro Santiago Ríos                    CP-2005-8

SALA ESPECIAL INTEGRADA POR EL JUEZ PRESIDENTE SEÑOR HERNANDEZ DENTON, EL JUEZ ASOCIADO SEÑOR RIVERA PEREZ Y LA JUEZA ASOCIADA SEÑORA FIOL MATTA.

SENTENCIA

San Juan, Puerto Rico, a 18 de diciembre de 2007.

Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte íntegra de la presente, concluimos que, la conducta desplegada por el licenciado Santiago Ríos no constituyó una violación a los Cánones 21 y 37, ni revistió la gravedad que contempla el Canon 38 de Ética Profesional, *supra*. Por tanto, declaramos Sin Lugar la querella presentada en su contra y ordenamos el archivo del asunto.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta concurre sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo